[S. F. No. 10312.  In Bank.—June 3, 1924.]

WENBAN ESTATE, INCORPORATED, Respondent, v.
EUGENE HEWLETT et al., Defendants and Appel-
lants, and FLORA WENBAN MILLS et al., Defend-
ants and Respondents.

[1] Contracts—Oral Negotiations—Subsequent Writing—Effect
of.—A written agreement speaks for itself and supersedes any
oral negotiations which may have preceded its making.

[2] Corporations—Action to Require Surrender of Bonds—Issu-
ance of Bonds—Finding—Evidence.—In this action by a cor-
poration to have certain of its bonds declared null and void and
its title thereto quieted, and to require the defendants to sur-
render and deliver them up to plaintiff, upon the ground that
said bonds were never issued by the corporation plaintiff nor
delivered to one of the defendants, who pledged or transferred
them to the other defendants, and that no consideration for their
issuance and delivery, if any, was ever given or received, the
finding of the trial court to the effect that the corporation did
not at any time authorize to be issued or delivered to any person
all or any of the bonds in suit was not only not supported by the
evidence but was contrary to the evidence.

[3] Id.—Individual and Corporation—Same Entity—Bonds—Evi-
dence.—In such action, the contention that the evidence without
substantial conflict was to the effect that a certain individual
and the corporation plaintiff were one and the same entity
and that, therefore, the acts and conduct of said individual when
dealing with one of the defendants, to whom said individual
caused the delivery of the bonds in suit to be made, with refer-
ence to such bonds, were the acts and conduct of the corporation
plaintiff and that, therefore, the corporation plaintiff will not be
heard to complain that the bonds in suit were not issued and delivered
by the corporation or that no consideration was received by it
from all, or any of the defendants, for the pledges or transfers
respectively made to them of said bonds, is well taken; and in
so far as it may be implied from the findings of the trial court
that said individual and the corporation were distinct and sep-
arate entities the findings were contrary to the evidence.

[4] Id.—Stockholders and Corporation as Identical Entities—
Fraud—Equity.—While it is the general rule that a corporation
is an entity separate and distinct from its stockholders, with
separate, distinct liabilities and obligations, nevertheless there is
a well-recognized and firmly settled exception to this general rule,
that, when necessary to redress fraud, protect the rights of third

persons, or prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished from those who hold and own the corporate capital stock, and deal with the corporation and stockholders as identical entities with identical duties and obligations.

[5] Id.—Sole Owner of All of Corporate Stock—Acts Those of Corporation.—Upon a sufficient showing that a corporation is but the instrumentality through which an individual, who is the sole owner of all of the corporate capital stock, for convenience transacts his business, equity, looking to the substance rather than the form of the relation and the law as well, will hold such corporation obligated for the acts of the sole owner of the corporation to the same extent and just as he would be bound in the absence of the existence of the corporation.

[6] Id.—Acts of Individual Owning All the Corporate Stock—Fraud—Equity—Evidence.—Proof that an individual owns all of the stock of a corporation and that the corporation is in truth and in fact but the corporate double of the owner of the stock, will, in conjunction with a further showing that as a result of the double relationship fraud or injustice will inure to a third person, suffice to dissipate the separate identity of the corporation; and in such a situation, where the rights of third persons are involved, the law will have no compunction in holding the contract of the owner of the corporation dealing with the corporate assets, to be the contract of the corporation.

[7] Id. — Fraud — Inequitable Results from Relationship — Evidence.—In order that the acts of an individual may be legally recognized as those of a corporation, it is not necessary that actual fraud be shown; it is sufficient if a refusal to recognize the fact of the identity of the corporate existence with that of the individual would bring about inequitable results. ·

[8] Id.—Disposition of Bonds—Contract Between Sole Owner of Corporate Stock and Another—Agency.—Where an individual is in fact the corporation, the relation of principal and agent to dispose of bonds of the corporation is created not only between said individual and another party but between the latter and the corporation as well by a provision in an agreement between said individual and said other party authorizing the latter "in his private capacity to mortgage, hypothecate, sell or trade the bonds at his own discretion" in order to create a fund for the improvement of the corporation's property.

[9] Id.—Disposition of Bonds—Agency Binding on Corporation.—Such corporation, through its *alter ego,* having conferred upon the agent the power and authority to dispose of the bonds as if they were his own and the bonds, as a result of such power and authority, having come into the possession of third parties for value,

in the ordinary course of business, the corporation will not thereafter be heard to complain that said agent did not have the power
to carry into effect his authorization.

[10] ID.—PLEDGE AND SALE OF BONDS BY AGENT—THIRD PARTIES—
NOTICE.—Such agent having had not only possession of the bonds
but also actual authority to dispose of them, the fact that pledgees
and transferees of such bonds made no inquiry as to said agent's
right or authority to pledge the bonds will not deprive them of
title or the right to possession thereof.

[11] ID.—SALE AND PLEDGE OF BONDS—CONSIDERATION TO CORPORA
TION—USE OF MONEYS.—Such agent being vested with power as
the corporation's agent to sell or pledge the bonds for the corporation's benefit, whatever consideration he received for their
sale or pledge became consideration for the bonds as effectually
as if the sale or pledge had been made by the corporation itself;
and such consideration did not fail merely because said agent
did not use the money derived from the sale or pledge of the
bonds for the purpose for which it was intended by his principal.

[12] ID.—CONTRACT BETWEEN SOLE OWNER AND AGENT—DELIVERY OF
BONDS TO AGENT ABSOLUTELY—CONSIDERATION—PRESUMPTIONS.—
An agreement between the sole owner of a corporation and her
attorney and agent, acknowledging a delivery to the latter of
certain bonds of the corporation in cancellation of past accounts
between the parties, being in writing, is itself presumptive evidence of a consideration therefor.

[13] ID.—CONTRACTS—CANCELLATION OF PAST ACCOUNTS BETWEEN
PARTIES—ACCOUNT STATED.—Such agreement, having purported to
cancel all past obligations between the parties thereto and, in
effect, having declared that in consideration of the cancellation
of past accounts between said parties the particular bonds were
delivered to the agent, was in the nature of an account stated, it
not being necessary in order to make it an account stated that
the mutual or cross-demands between the parties should have
been set out.

[14] ACCOUNT STATED—CONTRACTS—CONSIDERATION—AVOIDANCE OF
ACCOUNT—PLEADING—EVIDENCE.—While it is the general rule
that the expressed consideration of an agreement is not conclusive
upon the question as to what was in fact the real consideration
for the agreement, still it is a well-settled and recognized exception to this rule that the legal effect of an account stated may
not be opened and defeated by a mere showing of a lack of consideration, nor can an account stated be attacked and opened by
the party to whom it was rendered and accepted in any other way
than by appropriate pleading and proof of its procurement

---

13.  Law of accounts stated, note, 136 Am. St. Rep. 37.

through fraud, duress or mistake, or other ground which would appeal to a court of equity in an action for the avoidance of the account stated, this being so upon the theory that an attack upon an account stated for lack of consideration is forever foreclosed by the covenants and agreements of the parties, as · expressed in the agreement itself.

[15] CORPORATIONS — DELIVERY OF BONDS — CONSIDERATION — ACCOUNT STATED—PLEADING.—In an action by a corporation to compel the surrender of its alleged unissued bonds, a specified number of which were delivered by the sole owner of the corporation to her agent in consideration of the cancellation of past accounts between the parties, if the plaintiff had desired to initiate an opening and an avoidance of the account as stated between said owner and her agent, in so far as it concerned the bonds still remaining in the possession of the latter, it should have laid the ground therefor by an appropriate pleading.

[16] ID.—PLEADING—ACCOUNT STATED TENDERED BY ANSWER—FRAUD —EVIDENCE.—If, in such action, it had appeared from the answer of the agent that, with reference to the particular bonds delivered to the latter absolutely, the issue of an account stated was tendered, then the averments of the answer in that behalf would have constituted new matter and under our system of pleading would have been deemed denied; and under the general issue thus raised, on such new matter, the plaintiff would have been permitted to show fraud in the procurement of the account stated just as if such fraud had been specially and specifically pleaded.

[17] ID.—ADJUSTMENT OF DOUBTFUL RIGHT—ACCOUNT STATED—CONSIDERATION.—The adjustment of a doubtful right is a good ·consideration for an account stated, and therefore the party aggrieved will not be heard to say, in an endeavor to avoid the result of an account as stated, that the claim or demand upon which it was made and based was unjust and invalid.

[18] ID.—DELIVERY OF BONDS TO AGENT—CONSIDERATION—EVIDENCE.— In such an action, the record discloses undisputed facts tending to show that some consideration of value in the form of money, property, and services passed from the agent to the sole owner of the corporation and the corporation itself prior to the making of the written agreement between said owner and said agent, for the particular lot of bonds which were delivered to the latter absolutely.

[19] ID.—CONSIDERATION—BENEFIT TO CORPORATION—LEGALITY OF ISSUANCE OF BONDS.—If there is some consideration emanating from a legitimate transaction, one not tainted with fraud, and intended to redound to the benefit of the corporation, the constitutional and statutory requirements for the issue of corporate bonds, in so far as the corporation or its stockholders are concerned, are satisfied.

[20] ID.—BONDS—POSSESSION—DELIVERY—IDLE ACTS.—The fact that at the time of the written agreement between the sole owner of the corporation and the agent, which acknowledged a delivery of the bonds in suit to the latter, the bonds were already in the agent's possession as an officer of the corporation, does not disprove that there was an effective delivery of the bonds to the agent, the law not requiring that the agent go through the idle and useless ceremony of returning the bonds and delivering up the possession of them to the sole owner and then receive them back again in order to constitute a valid delivery. The acknowledgment of the delivery of the bonds already in the agent's possession being inconsistent with the supposition that he was continuing in possession of them in his capacity of managing director of the corporation was sufficient to constitute a complete delivery.

[21] ID.—EQUITY—STATUTE OF LIMITATIONS—SECTION 343, CODE OF CIVIL PROCEDURE.—Plaintiff's cause of action being for equitable relief, section 343 of the Code of Civil Procedure embodies the only statute of limitation applicable to the case.

[22] ID.—DETERMINATION OF ADVERSE CLAIMS—EQUITY—STATUTE OF LIMITATIONS — SECTION 1050, CODE OF CIVIL PROCEDURE. — The gravamen of the plaintiff's cause of action being that the bonds in suit, although existing and outstanding obligations of the corporation, and although apparently valid upon their face, are not and never were the bonded obligations of the corporation plaintiff, in its essence the action is one instituted pursuant to the provisions and permission of section 1050 of the Code of Civil Procedure to determine adverse claims made against the property of the plaintiff corporation, upon an alleged obligation of the plaintiff corporation, and whatever other relief may have been demanded in the prayer of plaintiff's complaint, such as a surrender up of the bonds in suit alleged to be held by defendants, is but a mere incident to the real relief sought by the plaintiff, viz., an adjudication that the plaintiff was not liable for any obligation purporting to emanate from the bonds in suit.

[23] ID.—VALIDITY OF BONDS—EQUITY—OUTSTANDING CLAIMS.—Equity will assume jurisdiction where it is claimed that outstanding bonds of a corporation are not the bonded obligations of the corporation, for if the securities are not valid obligations of the corporation plaintiff they ought not to be used or enforced, and this being so, it would be contrary to conscience to permit the parties holding the securities to retain them, since they could only do so for some sinister purpose.

[24] ID.—ADVERSE CLAIMS—PLEADING—SECTION 1050, CODE OF CIVIL PROCEDURE.—Plaintiff's complaint stated a cause of action sufficient to bring it within the purview of section 1050 of the Code of Civil Procedure, where it is inferable from all of the allegations thereof that the several defendants who were in possession of the

bonds in suit were asserting or were about to assert claims against the plaintiff based upon the obligations of said bonds, and where whatever defect there may be in the complaint in this particular was cured by the allegations of the answers and cross-complaints, which show definitely and affirmatively that the several defendants were asserting or about to assert a claim adverse to the plaintiff based upon the bonds in suit.

[25] ID.—EQUITY—MULTIPLICITY OF SUITS—DETERMINATION OF EQUITIES AND PRIORITIES BETWEEN PARTIES.—The action in question being one in equity, and equity having assumed jurisdiction of the subject matter and of the parties, should proceed, to the end of preventing a multiplicity of suits, to dispose of all of the equities and priorities, if any, existing between the several parties to the case.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. John T. Nourse, Judge. Reversed.

The facts are stated in the opinion of the court.

Jared How for Plaintiff and Respondent.

Haas & Dunnigan and Samuel M. Samter for Guaranty Trust & Savings Bank.

A. E. Cooley for Eugene E. Hewlett.

McNair & Stoker for W. W. McNair, Executor.

Jefferson P. Chandler and Thomas, Beedy & Lanagan for Security Trust & Savings Bank and Louis S. Beedy, Administrator.

McCutchen, Olney & Willard for Flora Wenban Mills et al.

Richard C. Harrison for Flora Wenban Mills, Executrix.

LENNON, J.—In this action in equity the plaintiff sought and secured a judgment against the defendants declaring 500 of the plaintiff's first mortgage bonds, of the par value of $500,000, to be null and void and requiring the defendants to surrender and deliver them up to plaintiff, upon the ground that said bonds were never issued by the corporation plaintiff nor delivered to the defendant Hewlett, who pledged

or transferred them to the other defendants, and that no consideration for their issuance and delivery, if any, was ever given or received as required by the fundamental and statutory law of the state, which provides that ''No corporation shall issue stock or bonds, except for money paid, labor done, or property actually received, . . . '' (Const., art. XII, sec. 11; Civ. Code, sec. 359.)

After the institution of this action Caroline S. Wenban, who was originally named as a defendant, died, and Flora Wenban Mills, the executrix of her will, was substituted in her place and stead. Mary A. Huntington, also originally named as a defendant in this action, died after the action was instituted. Howard Huntington, the executor of her will, was substituted as a defendant in her place and stead. Since the appeal was taken to this court Howard Huntington died and Louis S. Beedy was appointed administrator with the will annexed of Mary A. Huntington's estate in the place and stead of Howard Huntington as executor thereof, and said Beedy, as administrator, was in the court below substituted as defendant in his place and stead and a like order of substitution has been made by this court. Since the appeal was taken Mary E. Nelson, also named originally as a defendant in this action, died, and W. W. McNair was appointed executor of her will, and as such executor has been substituted as a defendant in her place and stead by orders made in the lower court and in this court.

The plaintiff's complaint consisted of two counts, the first of which only need be considered, with relation to the points presented in support of the appeal, for the reason that no findings were made in response to the issues involved in the second count.

The first cause of action pleaded in plaintiff's complaint alleges, among other things, that on the nineteenth day of June, 1909, the plaintiff, the Wenban Estate, Incorporated, executed a deed of trust bearing date July 1, 1908, to the Southern Trust Company, Incorporated. of Los Angeles, whereby the plaintiff corporation granted, conveyed, assigned, and transferred to said trust company, as trustee, certain property then owned by said plaintiff corporation, to secure, as the same should be issued and delivered by plaintiff, the payment, equally and without priority, of

1,000 bonds numbered consecutively from 1 to 1,000, both inclusive, bearing date of July 1, 1909. Said deed of trust, it was alleged, was thereafter delivered by the plaintiff corporation to said Southern Trust Company, as the trustee therein mentioned, and was on the eleventh day of August, 1909, duly recorded in the recorder's office of the city and county of San Francisco.

The plaintiff's complaint further alleges that 500 of said 1,000 bonds, which said trust deed was provided to secure, when the same should be issued and delivered by said plaintiff, were duly issued and delivered by said plaintiff corporation to one Caroline S. Wenban, as part consideration to her for certain property theretofore purchased from her by said plaintiff corporation and theretofore conveyed and transferred and delivered by her to said plaintiff corporation, and that said last-mentioned 500 bonds and all thereof so issued and delivered by said plaintiff corporation to said Caroline S. Wenban were issued and delivered by said plaintiff corporation in good faith for property received by said plaintiff corporation, and that they and each of said bonds became and were, through such issue and delivery, the valid and existing obligations of said plaintiff corporation secured by said deed of trust.

The complaint, however, further alleges that, save and except the 500 bonds issued and delivered to Caroline S. Wenban, none of the 1,000 bonds of said plaintiff described in the deed of trust from the plaintiff to the Southern Trust Company, as trustee, ever was issued or delivered or authorized to be issued or delivered by said plaintiff; and that the plaintiff has never received any consideration whatsoever for said bonds or any thereof; and that any purported issue or delivery of said bonds to any person or persons at any time was and is wholly without authority of this plaintiff and without consideration.

It is further alleged that fifty-one of such unissued and undelivered bonds are now in the possession of said plaintiff corporation; that four of said bonds are in the possession of Hewlett; that 200 of the bonds are in the possession of Mary A. Huntington and that ownership of said 200 bonds is claimed by her by virtue of a pretended transfer of the same from the defendant Hewlett; that 150 bonds are in the possession of the German-American Trust and Savings Bank,

and that this bank claims a right to the possession of said bonds by virtue of a claimed agreement of pledge with Hewlett; that fifteen of such bonds are in the possession of the Security Trust and Savings Bank and this bank claims the right of possession to said bonds by virtue of a claimed agreement of pledge with Hewlett; that eighty of said bonds are in the possession of Mary E. Nelson, right to the possession of which bonds was claimed by her by virtue of a claimed agreement of pledge with Hewlett; and that Mary A. Huntington claims the absolute ownership of an additional 200 of the bonds, some of which are now in the possession of either the plaintiff corporation or of the other defendants.

The complaint also alleges that the defendant Hewlett was during all of the times involved in the controversy in suit a member of the board of directors of the plaintiff corporation, and that all of the defendants had knowledge of this fact at all of the times of entering into the purported transactions by virtue of which they respectively claim ownership or the right of possession to the unissued and undelivered bonds in suit.

The plaintiff's complaint prayed that it be ordered, adjudged, and decreed that the bonds in suit were not valid obligations of the plaintiff corporation; that none of the defendants holding said bonds have any right or lawful claim thereto; that the defendants having possession of said bonds be ordered and directed forthwith to surrender and deliver the same to the plaintiff corporation; that the title to such bonds be quieted in the plaintiff corporation free and clear of all claims of any kind of said defendants; that the rights of the various holders of all of the bonds of the corporation plaintiff issued and outstanding and their priorities and equities between each other, if any such there be, be ascertained and determined.

The plaintiff's complaint, however, proceeded to pray further that in the event it should be determined that the defendants who are holding any of the bonds in suit or claiming (adversely to the plaintiff corporation) any interest therein are entitled to any rights or equities between themselves, or against any other of the defendants, on account of the possession of such bonds or the manner in which they came into the possession thereof, or otherwise, all

necessary accounts or accountings be made to the end that a proper decree be entered adjusting the rights of such several defendants, and the equities and liabilities of the plaintiff corporation; and further, to the same end, that a discovery be ordered and an accounting be had of the accounts between Mary A. Huntington and Eugene Hewlett, and between Caroline S. Wenban and Eugene Hewlett and that the various defendants holding said bonds or any of them as collateral security for the payment of any obligation or indebtedness entered into or incurred by the defendant Hewlett be ordered, directed, and required first to resort to the sale of any other securities held by them respectively as such collateral security for the payment of such indebtedness prior to making any attempted sale of any or all of said bonds.

Only the defendants, Hewlett, Howard Huntington as executor of the will of Mary A. Huntington, deceased, Mary E. Nelson, Guaranty Trust and Savings Bank, formerly the German-American Trust and Savings Bank, and the Security Trust and Savings Bank, answered the plaintiff's complaint and they, separately answering, while admitting the corporate existence of the plaintiff and other formal allegations, generally and specifically denied all other material allegations of the complaint. The defendants, Howard Huntington, as executor of the will of Mary A. Huntington, Mary E. Nelson and the Security Trust and Savings Bank, interposed the statute of limitations as a bar to the action. All of the several last-named defendants, save and except Hewlett, in addition to their answers interposed cross-complaints in which they pleaded in effect that they had acquired the bonds in suit in good faith, for value and without notice of any defect therein or of any adverse claim thereto. They then proceeded to allege, among other things, in substance and effect that at all of the times following the incorporation of the plaintiff and at all of the times mentioned in the plaintiff's complaint, Caroline S. Wenban was the owner of all of the capital stock of said Wenban Estate, Incorporated, and that at all of the times since the incorporation of the plaintiff she owned in her own right all of its corporate capital stock by reason of the fact that all of the stock originally subscribed for by the other stockholders was indorsed in blank by them and delivered to her for the pur-

pose of vesting in her title thereto; that no person other than the said Caroline S. Wenban paid any money or other thing of value for any of the capital stock of the Wenban Estate, Incorporated; that the directors and officers of said corporation during all of the times mentioned in the complaint carried out her instructions and wishes and were at all times dominated and controlled in their official corporate acts by her; that during all of the times since the incorporation of said plaintiff the defendant, Hewlett, was the agent and confidential adviser of said Caroline S. Wenban and was the agent of said corporation; that the plaintiff was incorporated and organized wholly and solely for the purpose of being and constituting an agency for said Caroline S. Wenban in the care, conduct, and control of her property and not for any other purpose; that during all of the times mentioned in the complaint said plaintiff acted as the agent and agency of said Caroline S. Wenban in the care, control, and management of her property; that the bonded indebtedness referred to in the plaintiff's complaint and purporting to have been created by said corporation, to wit, a bonded indebtedness of $1,000,000 represented by 1,000 bonds of the denomination of $1,000 each was created wholly and solely as a means employed on the part of Caroline S. Wenban to more easily and readily manage and control her property and for the purpose of procuring loans and funds to maintain and carry on the management of said property and pay the taxes and expenses thereof and make improvements thereon; that the corporation plaintiff did create a bonded indebtedness in the sum of $1,000,000 represented by 1,000 bonds of the denomination of $1,000 and numbered from 1 to 1000, consecutively; that the whole of said 1,000 bonds in plaintiff's complaint referred to, were certified to at one time by the Southern Trust Company, the corporation named as trustee in the trust deed which was ostensibly executed to cover the properties of the plaintiff corporation and given to secure the payment of said bonds; that said bonds were issued and executed by the said Caroline S. Wenban, president of, and Flora Wenban Mills, secretary of, the plaintiff corporation and in the name of the said corporation, all at the same time; that the seal of the corporation was impressed upon all of said bonds and at the same time; that for the purposes

above stated said Caroline S. Wenban did cause 500 of said bonds, designated and identified by their serial number, to be delivered to the defendant, Hewlett, and the remaining 500 of said bonds, designated and identified by their serial number, to be delivered to her, the said Caroline S. Wenban; that said Caroline S. Wenban, acting through said agency, the plaintiff corporation, vested the legal title to the said 500 bonds hereinabove enumerated as delivered to defendant Hewlett in him for the purpose and with the intent of having him sell, mortgage, hypothecate, pledge, or otherwise deal with the same as if the same were his own property and that he should handle the properties of said Caroline S. Wenban, make investments for her out of the proceeds of said bonds, pay taxes and assessments on her properties, namely, the property, title to which stood in the name of the corporation plaintiff, make improvements thereon and otherwise deal with her said properties irrespective of the corporation as if the title thereto stood in her name but using the said corporation as an agency for facilitating the handling of said properties; that said defendant Hewlet did, after receiving the said bonds, claim to be the owner thereof, with the knowledge and consent of said Caroline S. Wenban, and did dispose of a large portion of the same, and did pledge to the defendants and cross-complainants certain of said bonds and did hold himself out to be the owner thereof and was at all of the times vested with the ostensible and legal title thereto with the knowledge and with the consent of said Caroline S. Wenban, and did procure from the defendants and cross-complainants as proceeds of said loans large sums of money; that by the acts of said Caroline S. Wenban, so acting through the agency of the said corporation as aforesaid, the cross-complainants were deceived and misled into believing that the defendant Hewlett was the owner of said bonds and entitled to pledge and dispose of the same, and to deal with the same as if they were his own and thereby were induced to make the said loans and to pay to the said Hewlett large sums of money; that but for the acts of the said Caroline S. Wenban as aforesaid defendants and cross-complainants would not have made to defendant Hewlett, the said loans and would not have paid to said Hewlett the said or any sums of money and, finally, in effect that if the relief prayed for be granted to the plain-

tiff corporation it would under all the circumstances unjustly inure to and be for the benefit of Caroline S. Wenban and her successors in interest in the corporation plaintiff.

The cross-complainants prayed that it be ordered, adjudged, and decreed that they were the lawful owners and holders of said bonds and that their title to the same be quieted as against said plaintiff and cross-defendants and for general relief.

Upon the issues thus framed the trial court, among other things, found that "the plaintiff did not at any time issue or deliver or authorize to be issued or delivered to any person or persons any bond or bonds" other than a certain lot of 500 bonds which were issued and delivered to Caroline S. Wenban, which bonds, however, were not sought to be surrendered by this action. The trial court further found that "the plaintiff did not at any time receive any consideration by way of money paid, labor done or property actually received or otherwise or at all for any bond or bonds" sought to be declared void and of no effect by this action.

From these findings the trial court deduced the conclusion of law that the bonds in suit purporting to be secured by a deed of trust and now in the possession of the defendants Eugene Hewlett, Mary E. Nelson, Guaranty Trust and Savings Bank, formerly German-American Trust and Savings Bank, and Howard Huntington, as the executor of the will of Mary A. Huntington, deceased, "are not the bonds of the plaintiff and do not represent obligations of the plaintiff and no one of said instruments is a bond of the plaintiff or represents any obligation of the plaintiff." Accordingly it was adjudged and decreed that the defendants last above mentioned be required to deliver and surrender forthwith to the plaintiff said instruments in writing purporting to be the bonds of plaintiff and that the said defendants and each of them be enjoined and restrained from at any time asserting against the plaintiff, or against the Southern Trust Company, as trustee under said deed of trust, any claim based upon said instruments in writing, or any of them, or predicated upon any of the matters or things set forth or referred to in any of the cross-complaints and amended or supplemental cross-complaints or any pleading filed by said defendants in the action.

A review of the evidence adduced upon the entire case reveals a series of undisputed facts which, briefly stated, are these:

Prior to April 18, 1906, Caroline S. Wenban was the owner of an apartment house and a residence in San Francisco and some mining properties in the state of Nevada. The apartment house and residence were destroyed by the great fire of that date, which left Mrs. Wenban without any funds and without any income. Eugene Hewlett, attorney at law, a friend of Mrs. Wenban's daughter, Eva Shaw, became Mrs. Wenban's legal and financial adviser. Fire insurance money in the sum of $136,500 was collected by Hewlett upon authorization from Mrs. Wenban. In June, 1908, upon the advice of Hewlett, the corporation was formed for the express purpose of taking over, managing, and developing the properties of Caroline S. Wenban.

At the time the corporation was organized, 9,995 shares of its 10,000 shares of corporate capital stock were issued direct to Caroline S. Wenban. The remaining five shares were issued in order to qualify directors, one share to Caroline S. Wenban, on share to her daughter, Eva Shaw, one share to her daughter, Flora Wenban Mills, one to her business agent, George W. Merrill, and one share to defendant Eugene Hewlett. These shares were shortly thereafter indorsed, by the persons to whom they were originally issued, over to and delivered to Caroline S. Wenban, who has ever since held them as sole owner. She controlled the corporation in all of its actions, and the officers of the corporation, who were members of her family, did whatever she wanted them to do with regard to the corporation.

A resolution dated June 12, 1908, was adopted by the corporation plaintiff authorizing the issuance of 1,000 bonds of the par value of $1,000. Five hundred of these bonds were delivered to Caroline S. Wenban. As a consideration for the transfer to her of all of the shares of the corporation and the delivery to her of the 500 bonds, Caroline S. Wenban conveyed and transferred to the corporation plaintiff all of her real property. The remaining 500 bonds came into the possession of defendant Hewlett as managing director of the corporation. Fifty-one of these bonds were returned by Hewlett to the corporation. They were returned, however, as a preliminary step to the cancellation

of a certain agreement between defendant Hewlett and Caroline S. Wenban, which agreement, however, was not canceled, and as to these bonds Hewlett claims the right, title, and interest. Four of the bonds are now in the possession of Hewlett. The eighty bonds held by Mary E. Nelson, the 150 bonds held by the Guaranty Trust and Savings Bank, formerly the German-American Trust and Savings Bank, and the fifteen bonds held by the Security Trust and Savings Bank are held respectively under a claimed right to possession as security for the payment of indebtedness evidenced by promissory notes of Hewlett. The 200 bonds held by the executor of Mary A. Huntington are held under claim of absolute ownership for the repayment of a debt owing by Hewlett at the time of their transfer to Mary A. Huntington and also for a new consideration advanced to him at that time.

It is the claim of Hewlett, as evidenced by his testimony, that the 500 bonds in suit were issued and delivered to him by the corporation for a valuable consideration, and that by reason thereof he became the absolute owner of said bonds. It is the contention of the plaintiff corporation that Hewlett's claim is disputed and dissipated by the established facts and circumstances preceding, attending, and following the formation of the corporation and that these facts and circumstances show that Hewlett obtained the manual possession of the bonds merely by reason of his position as managing director of the corporation, and not otherwise, and that the bonds of the corporation now in suit were never in fact issued or delivered to Hewlett, and that no consideration was paid by him for them, and finally, that in reality the bonds never had any existence as valid and existing obligations of the corporation but were mere worthless pieces of paper.

In support of his claim that he became the legal owner of and entitled to the possession of 500 bonds of the plaintiff corporation, Hewlett, in his testimony, narrated the circumstances attending the formation and management of the plaintiff corporation, detailed certain conduct on the part of Caroline S. Wenban and relied upon certain written agreements between Caroline S. Wenban and himself from which he claims the result follows that he did become the legal owner of the bonds.

In this behalf Hewlett testified in substance that shortly after the fire of 1906 an oral agreement was entered into between himself and Caroline S. Wenban whereby he obligated himself to finance a corporation to be formed to operate the properties of Caroline S. Wenban and to pay out of the earnings of the corporation $1,000 a month to Caroline S. Wenban for her personal use, and in the event that the corporation did not yield that amount per month, he, Hewlett, was to make good the difference. According to Hewlett, at the time of the original oral agreement there was no definite understanding as to what he should receive in return for his services, but later it was worked out and agreed that he should receive for such services 500 of the bonds of the corporation when it was formed.

Whether or not there was actually an oral agreement between Hewlett and Caroline S. Wenban prior to the formation of the corporation is immaterial, inasmuch as such agreement, if any, was, as the record shows, subsequently superseded by a written agreement dated March 16, 1910. [1] Under the well-recognized rule, the written agreement speaks for itself and supersedes any oral negotiations which may have preceded its making. (Civ. Code, sec. 1625.)

On June 23, 1908, so Hewlett testified, a meeting of the directors of the corporation was held and a resolution adopted authorizing the delivery of 500 [hundred] bonds to Hewlett, which action of the directors was on the same day approved by all the owners and holders of the subscribed capital stock of the corporation. A duplicate copy of the minutes of the meeting of the directors, signed by Caroline S. Wenban, Flora Wenban Mills, and Eva Shaw, was offered and received in evidence by defendant Howard Huntington, executor of the will of Mary A. Huntington, who is claiming through Hewlett. Those minutes are as follows:

"Directors' meeting of the Wenban Estate, Incorporated.

"Held on the 23rd day of June, 1908, Caroline S. Wenban, President of the Board, presiding. The Secretary read the minutes of the previous meeting of the Board, held on the 19th day of June, 1908, which, on motion duly seconded, were approved.

"E. E. Hewlett delivered the Secretary of the Company Sixty (60) shares of the Southern Trust Company stock, ... shares of the Riverside Improvement Company Stock,

Deed of boarding house on Hill and Court Streets, Los Angeles, an order for Six Hundred (600) shares of Flora Park, Incorporated, stock, a written promise of Howard E. Huntington endorsed over by E. E. Hewlett, of one-fourth (1/4) of the capital stock of Pacific Annuity Company to be delivered to the Wenban Estate, Incorporated; also vouchers for Eighty-six Thousand Dollars ($86,000.00).

"On motion duly seconded, the above property was duly accepted by the Company by unanimous vote. And upon motion made by Eva J. Shaw, seconded by Flora Wenban Mills, it was unanimously resolved that Five Hundred (500) bonds of the Wenban Estate, Incorporated, be delivered to E. E. Hewlett. . . .

"There being no further business, on motion the meeting adjourned.

"[Signed]   CAROLINE S. WENBAN.<br>
"FLORA WENBAN MILLS.<br>
"EVA J. SHAW."

There was also offered and received in evidence the minutes of a shareholders' meeting held on the same day which approved the prior resolution authorizing the delivery of 500 bonds to Hewlett, which minutes are as follows:

"Stockholders' Meeting of the Wenban Estate, Incorporated. "Held on the 23rd day of June, 1908, Caroline S. Wenban, President, and all the owners and holders of the subscribed capital stock of the company were present, namely:

"Caroline S. Wenban<br>
"Eva J. Shaw<br>
"Flora Wenban Mills<br>
"George W. Merrill<br>
"E. E. Hewlett.

"The Secretary read the minutes of the previous meeting of the Stockholders, held on 19th day of June, 1908, which, on motion duly seconded, were approved.

"The Secretary was then directed to read the minutes of the Directors' meeting of the Wenban Estate, Incorporated, held June 23rd, 1908; the secretary then read the minutes as were engrossed on the pages of the Company's books. Thereupon, on motion of Flora Wenban Mills, seconded by Eva J. Shaw, it was unanimously resolved that the business transacted at said meeting be unanimously ratified and approved.

"There being no further business before the Stockholders, on motion the meeting adjourned.

"CAROLINE S. WENBAN.
"EVA J. SHAW.
"FLORA WENBAN MILLS."

The evidence shows, we think, without conflict that a meeting of the corporation was held at which the resolution authorizing the delivery of the bonds to Hewlett was passed and adopted as the act of the plaintiff corporation. This is shown by the duplicate minutes of the two meetings held on June 23, 1908, the one authorizing the delivery of the bonds to Hewlett and the other ratifying that authorization. It is true that Mrs. Mills at the time of the taking of her deposition, which was some three years and six months prior to the trial of the case, testified, "I don't think there was any such meeting . . . I know it was impossible at that time . . . owing to the illness of my sister, Mrs. Shaw, in Burlingame. She could not leave the house at all." Mrs. Caroline S. Wenban, however, testified that a meeting had been held at Burlingame, and when asked if she remembered the meeting, replied, "Not very clearly, I do not." But added, "I know something about it." She testified that this meeting had been held in Burlingame *because* of the illness of her daughter, Mrs. Shaw, and that the condition of Mrs. Shaw's health at that time was such that she could sign the minutes of the meeting. Mrs. Mills, when testifying as a witness at the trial, and when confronted with the signed duplicate of the minutes of the meeting of the directors on June 23, 1908, which in their signed form were not called to her attention when giving her deposition, testified that duplicate minutes were always signed and that the signatures attached to the minutes of the meeting in question of Caroline S. Wenban, Eva J. Shaw and herself were genuine. She did not then testify that no such meeting was held. She did say, however, "I don't think I attended any meeting of June 23, 1908," and when asked if the signatures to the minutes of the meeting of June 23, 1908, which she admitted were genuine, did not refresh her memory concerning the time and circumstances under which she signed, she replied, "No, but I know that my sister was very ill. She must have signed it in bed."

It will thus be seen that Flora Wenban Mills based her notion that no corporate meeting was held on June 23, 1908, and that such a meeting was impossible, on the fact that her sister, Mrs. Shaw, was ill in Burlingame at that time. Other evidence, however, as previously indicated, tends to show, and without contradiction, that a corporate meeting was held at Burlingame during the time that Mrs. Shaw was ill and that she was able at that time to sign the minutes of the meeting. Mrs. Mills fixes the time of the meeting in question at a time when her sister, Mrs. Shaw, was ill and Caroline S. Wenban, without contradiction, testified that a corporate meeting was held at Burlingame during the time of the illness of Mrs. Shaw. If Mrs. Mills is correct in her recollection of the time and of the place of her sister's illness, evidently such illness did not render a corporate meeting of that date at Burlingame impossible or improbable.

In short, Mrs. Mills' testimony concerning the fact as to whether or not a corporate meeting was held on the date in question is so nebulous and evanescent as to render it nothing more than a mere pretense of evidence (*Field* v. *Shorb*, 99 Cal. 661, 666 [34 Pac. 504]; *In re Wilson*, 117 Cal. 262, 269 [49 Pac. 172, 711]; *Estate of Tibbetts*, 137 Cal. 123, 128 [69 Pac. 978]; *Estate of Morey*, 147 Cal. 495, 506 [82 Pac. 57]; *Houghton* v. *Loma Prieta Co.*, 152 Cal. 574, 578 [93 Pac. 377]), and, therefore, it may be said that, as a matter of law, it is not any evidence at all. It does not, therefore, contradict or tend to contradict, either directly or by justifiable inference, the positive evidence that such a meeting was held. The positive and unequivocal character of the corporate minutes, coupled with the testimony of Caroline S. Wenban, compels the conclusion that the evidence sufficiently shows that corporate meetings were held on June 23, 1908, and that the resolutions recited in the minutes referred to were regularly passed and adopted as the act of the corporation plaintiff. [2] It follows that the finding of the trial court to the effect that the corporation did not at any time authorize to be issued or delivered to any person all or any of the bonds in suit is not only not supported by the evidence but is contrary to the evidence.

On August 26, 1909, Caroline S. Wenban signed and acknowledged before a notary public a formal assignment

conveying 500 of the corporation's bonds to Hewlett. There is no denial by the respondents that such a conveyance was made and executed by Caroline S. Wenban and it must, therefore, be taken as an admitted fact in the case.

It is to be noted that the bonds of the corporation were not in physical existence at the time of the resolution of the plaintiff corporation authorizing the delivery of the 500 bonds to Hewlett nor were such bonds in existence at the time of the written conveyance by Caroline S. Wenban to Hewlett of the bonds.

It is not disputed that the total issue of bonds of the corporation was, on February 7, 1910, certified by the Southern Trust Company, as trustee, under the deed of trust, and that at some time between that date and March 16, 1910, Hewlett came into actual physical possession of the bonds.

On March 16, 1910, Caroline S. Wenban entered into a formal written agreement with Hewlett by which Hewlett agreed to "finance" the corporation and to guarantee to Caroline S. Wenban a monthly income of $1,000 during the existence of the bond issue. On her part, by the agreement, Caroline S. Wenban "ratified the conveyance and delivery heretofore made" to Hewlett of 500 bonds of the Wenban Estate, Incorporated. It was provided by this agreement that 400 of the bonds, or an amount of property equivalent to the then value of the bonds, should be held by Hewlett in a separate trust account as security for the performance of his covenants contained in the agreement. This agreement expressly provided that Hewlett might "in his private capacity, mortgage, hypothecate, sell or trade said bonds at his own discretion." The remaining 100 bonds from 1 to 100 inclusive, were, so the agreement reads, "delivered to" Hewlett "in cancellation of past accounts"; that agreement expressly providing that "all past obligations between the parties hereto are hereby canceled." The agreement provided that Hewlett should have no charge or obligation against Caroline S. Wenban or the corporation except out of the income of the corporation and in the event of the cancellation of the agreement Hewlett was not to be paid in money "for work, labor or services rendered or for interest on the money advanced" but should be allowed in bonds the difference in the value of the 400

bonds above mentioned at the time of the making of the agreement and their value at the time of the cancellation of the agreement.

There is no denial by the plaintiff corporation of the execution of the written agreement of March 16, 1910, by Caroline S. Wenban and the execution of the agreement must also be taken as an admitted fact in the case.

[3] We are now brought to a consideration of the point primarily presented in support of a reversal of the judgment, viz., that the evidence adduced upon the entire case without substantial conflict was to the effect that Caroline S. Wenban and the corporation were one and the same entity and that, therefore, the acts and conduct of Caroline S. Wenban when dealing with Hewlett, with reference to the bonds in suit, were the acts and conduct of the corporation plaintiff and, therefore, the corporation plaintiff will not be heard to complain that the bonds in suit were not issued and delivered by the corporation or that no consideration was received by it from all, or any of the defendants, for the pledges or transfers respectively made to them of said bonds.

This contention is, we think, well taken.

Upon this phase of the case it is obvious that the trial court, in its findings, endeavored to preserve the integrity and independence of the corporation plaintiff as a separate entity from that of Caroline S. Wenban. While the trial court does not in terms make such a finding, nevertheless it is fairly inferable from its findings, as a whole, that the findings, as made, bearing upon this phase of the case, were predicated only upon the theory that the corporation was not bound by the acts and conduct of Caroline S. Wenban. This, we think, under all of the undisputed evidence bearing upon this phase of the case, could not rightly be done and that in so far as it may be implied from the findings of the trial court that Caroline S. Wenban and the corporation were distinct and separate entities the findings are contrary to the evidence.

That the identity of Caroline S. Wenban and the corporation are the same cannot, under the practically admitted facts of the case, be doubted or disputed. She was at all times following the formation of the corporation the sole owner of all of the shares of the stock of the corporation.

Caroline S. Wenban at all times controlled and directed the affairs of the corporation as if she and the corporation were one. She herself testified in effect that all of the corporate stock of the corporation belonged to her and that she practically controlled the corporation in all of its actions and that the directors of the corporation, who were members of her family, did whatever she wanted them to do with regard to the corporation, and this testimony stands undisputed. The corporation was organized for the sole purpose of owning and operating Caroline S. Wenban's property. It was created merely as a convenience for the management of her property. There was a complete unity of interest and ownership in the assets of the corporation between Caroline S. Wenban and the corporation. In other words, the corporation was her *alter ego*. That the corporation was looked upon as the *alter ego* of Caroline S. Wenban is evidenced by the acquiescence of the other directors of the corporation in her conduct whereby she treated the bonds of the corporation as her own. In such a situation her responsibility as the sole shareholder of the corporation, when dealing with the assets of the corporation, was the corporation's responsibility, and conversely the obligation of the corporation in this particular situation is her obligation.

[4] While it is the general rule that a corporation is an entity separate and distinct from its stockholders, with separate, distinct liabilities and obligations, nevertheless there is a well-recognized and firmly settled exception to this general rule, that, when necessary to redress fraud, protect the rights of third persons, or prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished from those who hold and own the corporate capital stock, and deal with the corporation and stockholders as identical entities with identical duties and obligations.

[5] Accordingly, it has been held that upon a sufficient showing that a corporation is but the instrumentality through which an individual, who is the sole owner of all of the corporate capital stock, for convenience transacts his business, equity, looking to the substance rather than the form of the relation, and the law as well, will hold such corporation obligated for the acts of the sole owner

of the corporation to the same extent and just as he would be bound in the absence of the existence of the corporation. (*Llewellyn Iron Works* v. *Abbott Kinney Co.,* 172 Cal. 210 [155 Pac. 986]; *Commercial Security Co.* v. *Modesto Drug Co.,* 43 Cal. App. 162 [184 Pac. 964]; *Minifie* v. *Rowley,* 187 Cal. 481 [202 Pac. 673].) **[6]** Thus proof that an individual owns all of the stock of a corporation and that the corporation is in truth and in fact but the corporate double of the owner of the stock, will, in conjunction with a further showing that as a result of the double relationship fraud or injustice will inure to a third person, suffice to dissipate the separate identity of the corporation. (*Minifie* v. *Rowley, supra.*) In such a situation, where, as here, the rights of third persons are involved, the law will have no compunction in holding the contract of the owner of the corporation dealing with the corporate assets, to be the contract of the corporation. (*Porter* v. *Lassen County Land Co.,* 127 Cal. 261 [59 Pac. 563]; *Schuyler* v. *Pantages,* 54 Cal. App. 83 [201 Pac. 137]; *Swartz* v. *Burr,* 43 Cal. App. 442 [185 Pac. 411].)

In *Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 Pac. 641], it was held that in order to cast aside the legal fiction of distinct corporate existence it must appear that "they are the 'business conduit and *alter ego* of one another' and that to recognize their separate entities would aid the consummation of a wrong."

*Minifie* v. *Rowley, supra,* states the rule to be: "Before the acts and obligation of a corporation can be legally recognized as those of a particular person, and *vice versa,* the following combination of circumstances must be made to appear: First, that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of the said person has ceased; second, that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice. . . . It is not necessary . . . that the complaint allege actual fraud; it is sufficient if the facts set forth disclose that the dealings were in form with a corporation but in reality with an individual and that a refusal to recognize this fact will bring about inequitable results."

It is at once apparent, in the instant case, that an adherence to the fiction of independent corporate existence would permit Caroline S. Wenban, despite the fact that she herself ignored the corporate fiction and treated the bonds in suit as her own, to seek shelter behind a corporate existence, which was no more nor less than her individual self, and thereby escape all liability for obligations to third persons incurred by her in her dealings with the assets of the corporation. In short, an adherence to the fiction of independent corporate existence, under the circumstances of the instant case, would permit Caroline S. Wenban to secure an advantage over third persons, through the medium of the corporation, to which she would not be entitled as an individual and which it would be inequitable to permit her to obtain and retain.

True, there is no showing or claim of fraud in the instant case on the part of Caroline S. Wenban or the corporation plaintiff. **[7]** Still, as previously indicated, it is not necessary that actual fraud be shown. It is sufficient if a refusal to recognize the fact of the identity of the corporate existence with that of the individual would bring about inequitable results. All of the facts and circumstances surrounding the inception of and attending the controversy in suit bring the case clearly within the two requirements declared in *Minifie* v. *Rowley, supra,* to be sufficient to constitute the cause of action stated in the cross-complaints of the several appellants.

Although in the instant case it is the corporation which is seeking to have the bonds annulled, such relief, if effected, would obviously be for the benefit of Caroline S. Wenban as sole shareholder. As was said in *Home Fire Ins. Co.* v. *Barber,* 67 Neb. 644 [108 Am. St. Rep. 716, 60 L. R. A. 927, 93 N. W. 1024], where a corporation "is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery; and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf and for their advantage, the corporation will not be permitted to recover."

The acts of Caroline S. Wenban being the acts of the corporation, the contract of Caroline S. Wenban of March 16, 1910, is the contract of the corporation and binding upon it.  The resolution of the corporation of June 28, 1908, and the written conveyance of Caroline S. Wenban of August 26, 1909, both purporting to convey 500 bonds to Hewlett, are to be read and construed in the light of this ultimate and final agreement between Hewlett and Caroline S. Wenban.  This agreement represents the final understanding of the parties thereto and clarifies and controls the terms of the preceding instruments.

It is evident that the delivery of the 500 bonds, expressly ratified in said agreement, was never intended to be a delivery for the purpose of vesting title to the entire 500 bonds in Hewlett.  The agreement does, however, on its face show that title to 100 of the bonds, numbered 1 to 100, inclusive, was intended to be vested in Hewlett in cancellation of past accounts.  The mere fact that 100 of the bonds were so segregated as payment for past accounts clearly evidences, when considered in conjunction with the other recitals of the instrument, the fact that the remaining 400 bonds were delivered to him, not for his own personal use and benefit, but for the purpose of financing the affairs of the corporation.  Indeed, the contract itself expressly provides that the 400 bonds or the equivalent in property shall be kept in a separate trust fund.  Incidentally it may be noted again that the contract provides that for Hewlett's future labor, services, and money advanced, he shall be paid in bonds equivalent in value to the difference between the value of the 400 bonds at the time of the agreement and their value at the time of the cancellation.  This fact shows that it was not intended to pass title in the 400 bonds to Hewlett at the time of the agreement, for, manifestly, if it were the intent of the agreement that he was to be the absolute owner of the bonds he would be entitled to the full value of the bonds at the time of the cancellation of the agreement.  Hewlett, therefore, became the actual and absolute owner of only 100 of the bonds.

[8]  As to the other 400 bonds, however, he was expressly authorized "in his private capacity to mortgage, hypothecate, sell or trade the bonds at his own discretion" in order to create a fund for the improvement of the corporation

plaintiff's property. By such provision he was made an agent of Caroline S. Wenban, the sole owner of the corporation, and consequently the agent of the corporation to dispose of the bonds. In short, the conclusion is inescapable that the relation of principal and agent existed not only between Caroline S. Wenban and Hewlett but between Hewlett and the corporation as well. [9] The corporation, through its *alter ego,* having conferred upon Hewlett the power and the authority to dispose of the bonds as if they were his own and the bonds, as a result of such power and authority, having come into the possession of third parties for value, in the ordinary course of business, the corporation will not now be heard to complain that Hewlett did not have the power to carry into effect his authorization. (*Grange* v. *Judah Boas Co.,* 60 Cal. App. 484 [213 Pac. 712].)

[10] The fact that the appellants other than Mary Huntington made no inquiry as to Hewlett's right or authority to pledge the bonds will not deprive them of title or the right to possession thereof. Hewlett had not only possession of the bonds but had actual authority to dispose of them. It is the fact of actual authority and not the knowledge of the fact on the part of the pledgees and transferees which is the controlling factor. (*Fairmont Creamery Co.* v. *Los Angeles Ice & Cold Storage Co.,* 33 Cal. App. 414 [165 Pac. 553], 47 Cal. App. 103 [190 Pac. 194].)

[11] Hewlett being vested with power as the corporation's agent to sell or pledge the bonds for the corporation's benefit, it follows that whatever consideration he received for their sale or pledge became consideration for the bonds as effectually as if the sale or pledge had been made by the corporation itself.

The evidence shows without contradiction that the Security Trust & Savings Bank loaned Hewlett $7,500 upon the security of fifteen of the bonds; the Guaranty Trust and Savings Bank (formerly German-American Trust & Savings Bank) loaned him $50,000 on the security of 150 of the bonds; Mary E. Nelson loaned him $31,500 upon the security of eighty of the bonds; Mary A. Huntington loaned him $200,000 on the security of 200 of the bonds.

All of this money, under the undisputed facts, must be regarded as consideration for the bonds and did not fail to be such consideration merely because Hewlett did not

use the money for the purpose for which it was intended by his principal. For that breach of trust the corporation had its remedy over against Hewlett for an accounting and settlement.

Obviously this case is not analogous to those cases which hold that where an agent or an employee obtains possession of non-negotiable instruments merely by reason of the fact that he had access thereto and disposes of them without right, no title could be transferred by such agent or employee.

Either, therefore, by reason of the absolute ownership of Hewlett in 100 of the bonds or by reason of his express authority to dispose of the remaining 400 bonds as his own, the appellants herein to whom Hewlett pledged or transferred the bonds have legal title to or right to possession of the bonds which are now in their possession.

Holding, as we do with reference to 400 of the bonds in suit, that Hewlett held the same as the agent of Caroline S. Wenban and that she, when conferring the power of agency upon Hewlett, was, as the sole owner of the corporation, acting for the corporation and that the consideration which he received from the purchasers and pledgees of the bonds was a consideration to the corporation, eliminates any need for a discussion of the point made that there was no consideration from Hewlett to Caroline S. Wenban and the corporation plaintiff for the transfer and delivery to him of said 400 bonds. We are still, however, confronted with the contention that there is no evidence of a consideration emanating from Hewlett to Caroline S. Wenban or the corporation plaintiff for the transfer and delivery to him of that lot of bonds in suit numbered 1 to 100. [12] Upon this phase of the case it may be said that the written agreement dated March 16, 1910, which acknowledged a delivery of the 100 bonds immediately under discussion to Hewlett in cancellation of past accounts, being in writing, is itself presumptive evidence of a consideration therefor. (Civ. Code, sec. 1614.) [13] Moreover, the agreement, as previously noted, purported to cancel all past obligations between the parties thereto and, in effect, declared that in consideration of the cancellation of past accounts between said parties the particular bonds last referred to were delivered to the defendant Hewlett. Indeed, it may be said

that this agreement, in the particulars referred to, was in the nature of an account stated. True, this agreement does not, in terms or otherwise, set out mutual or cross-accounts or demands between the parties, but this was not necessary in order to make it an account stated. It clearly and unequivocally, we think, expressly acknowledges a pre-existing debt and marks and measures the compensation which was given and accepted in satisfaction of that debt and this acknowledgment of the debt was sufficient to form the basis of an account stated. In short, it is a complete account stated because it embodies a signed written acknowledgment of an unqualified indebtedness or liability accompanied by a delivery and acceptance in payment of the indebtedness of the lot of bonds referred to therein as being numbered from 1 to 100, inclusive.

[14] While it is the general rule that the expressed consideration of an agreement is not conclusive upon the question as to what was in fact the real consideration for the agreement, still it is a well-settled and recognized exception to this rule that the legal effect of an account stated may not be opened and defeated by a mere showing of a lack of consideration, nor can an account stated be attacked and opened by the party to whom it was rendered and accepted in any other way than by appropriate pleading and proof of its procurement through fraud, duress, or mistake, or other ground which would appeal to a court of equity in an action for the avoidance of the account stated. This is held to be so upon the theory that an attack upon an account stated for lack of consideration is forever foreclosed by the covenants and agreements of the parties, as expressed in the agreement itself. (*Gardner* v. *Watson,* 170 Cal. 570 [150 Pac. 994].)

The plaintiff's first cause of action does not seek to avoid the legal effect of the agreement in question in so far as it purports to be an account stated between Caroline S. Wenban and Hewlett by any allegation in substance or effect that it was procured through fraud, duress, or mistake. [15] If the plaintiff had desired to initiate an opening and an avoidance of the account as stated, in so far as it concerned the bonds still remaining in the possession of the defendant Hewlett, it should have laid the ground therefor by an appropriate pleading. (*Gardner* v. *Watson, supra;*

*Merchants' Nat. Bank* v. *Carmichael,* 50 Cal. App. 749, 759 [196 Pac. 76].) **[16]** Of course, it goes without saying, if it had appeared from the answer of the defendant Hewlett that, with reference to these particular bonds, the issue of an account stated was tendered, then the averments of the answer in that behalf would have constituted new matter and under our system of pleading would have been deemed denied. (Code Civ. Proc., sec. 462.) Under the general issue thus raised, on such new matter, the plaintiff would have been permitted to show fraud in the procurement of the account stated just as if such fraud had been specially and specifically pleaded. (*Sterling* v. *Smith,* 97 Cal. 343, 346 [32 Pac. 320].)

While it is true that the allegations of the plaintiff's second cause of action charge the defendant Hewlett with misrepresentations, deceit, abuse of confidential relations and fraud generally in his dealings with Caroline S. Wenban, and particularly with reference to the existence of the agreement of March 16, 1910, which embodies the account stated, this second cause of action does not in terms purport to proceed upon the theory that the account stated in that agreement between Hewlett and her was to be avoided because of fraud in its procurement. Nor did the trial court find that it was conceived and consummated in fraud. Liberally construed the allegations of the second cause of action might perhaps be rightly considered as a pleading for an opening and an avoidance of the account stated, but even so the plaintiff's allegations of that cause of action are specifically denied by the defendant Hewlett, and the record shows that the issues raised by the pleadings on the second cause of action were never determined by the trial court.

**[17]** If it be conceded that after events disclosed by the record before us tend to show that the account stated was made and based upon a claim or demand of doubtful validity and value, still the adjustment of a doubtful right is a good consideration for an account stated, and therefore the party aggrieved will not be heard to say, in an endeavor to avoid the result of an account as stated, that the claim or demand upon which it was made and based was unjust and invalid. (*Gardner* v. *Watson, supra.*) It may be safely said, we think, that the recitals of the agreement itself, in addition

to the fact that, as a written instrument, it imported a consideration, sufficiently show that at the time of the making of. the agreement Hewlett was asserting some claim and making some demand upon Caroline S. Wenban the justness, if not the legality, of which she recognized and accepted by her formal written agreement.

[18] Apart from the foregoing consideration an inspection of the record before us discloses undisputed facts tending to show that some consideration of value in the form of money, property, and services passed from Hewlett to Caroline S. Wenban and the corporation plaintiff prior to the making of the agreement of March 16, 1910, for the particular lot of 100 bonds immediately under discussion. Thus there is evidence uncontradicted to the effect that the defendant Hewlett agreed to pay, and did pay, certain designated legitimate obligations of the corporation running into large amounts of money, and that he did, prior to the execution of the agreement of March 16, 1910, perform certain services for Caroline S. Wenban and the corporation before and after the corporation was organized, which services were rendered in the promotion of the affairs of the corporation and which inured to the benefit of the corporation itself. That these advances and services were consideration for the transfer to Hewlett of the particular 100 bonds under discussion and specifically designated in the agreement of March 16, 1910, is evidenced, we think, by the fact that Mrs. Caroline S. Wenban, by that agreement, recognized that Hewlett had given some consideration of some value prior to the making of that agreement for the transfer to him of said 100 bonds. [19] And it is the rule that if there is some consideration emanating from a legitimate transaction, one not tainted with fraud, and intended to redound to the benefit of the corporation, the constitutional and statutory requirements for the issue of corporate bonds, in so far as the corporation or its stockholders are concerned, are satisfied. (*McKee* v. *Title Ins. Co.,* 159 Cal. 206 [113 Pac. 140]; *California Trona Co.* v. *Wilkinson,* 20 Cal. App. 694 [130 Pac. 190].)

[20] Some contention is made that there was not an actual manual tradition from either the corporation or from Caroline S. Wenban to Hewlett of the bonds, and that, therefore, there was no legal delivery. This contention is

founded upon the fact that at the time of the written agreement of March 16, 1910, between Hewlett and Caroline S. Wenban, which acknowledged a delivery of the bonds in suit to Hewlett, the same were already in his possession as an officer of the corporation. In such a situation it cannot be said that there was no effective delivery. The law does not require, under the circumstances of the instant case, that in order to constitute a delivery it was necessary for Hewlett to go through the idle and useless ceremony of returning the bonds and delivering up the possession of them to Caroline S. Wenban and then receive them back again in order to constitute a valid delivery. The acknowledgment of the delivery of the bonds already in Hewlett's possession being inconsistent with the supposition that Hewlett was continuing in possession of them in his capacity of managing director of the corporation, was sufficient to constitute a complete delivery. (*Snider* v. *Thrall*, 56 Wis. 674 [14 N. W. 814].)

[21] The plea of the bar of the statute of limitations set forth in the several answers of the defendants was rightly rejected by the trial court. The plaintiff's cause of action is for equitable relief, and, therefore, section 343 of the Code of Civil Procedure embodies the only statute of limitation applicable to the case. While the action is one for equitable relief, it is not in its primary purpose nor in the strict sense a mere action for the cancellation of instruments. [22] The gravamen of the plaintiff's cause of action is that the bonds in suit, although existing and outstanding obligations of the corporation, and although apparently valid upon their face, are not and never were the bonded obligations of the corporation plaintiff. In its essence it was an action instituted pursuant to the provisions and permission of section 1050 of the Code of Civil Procedure to determine adverse claims made against the property of the plaintiff corporation, upon an alleged obligation of the plaintiff corporation, and whatever other relief may have been demanded in the prayer of plaintiff's complaint, such as a surrender up of the bonds in suit alleged to be held by appellants, is clearly but a mere incident to the real relief sought by the plaintiff, viz., an adjudication that the plaintiff was not liable for any obligation purport-

193 Cal.—45

ing to emanate from the bonds in suit. The origin and purpose of the above-cited code section are evidently to be found in that principle of equity jurisprudence which confers jurisdiction upon courts for the purpose of administering protective and preventive justice by directing the delivery up of securities or other instruments which, although not void on their face, are alleged, in truth and in fact, to be void and invalid obligations and which may be vexatiously and injuriously used at a distance of time when the proper evidence to repel the claim may have been lost or obscured, against the person upon whom the obligation is placed.

[23] Equity will assume jurisdiction in such a situation, for if, as alleged, the securities in suit were not valid obligations of the corporation plaintiff they ought not to be used or enforced, and this being so, it would be contrary to conscience to permit the parties holding the securities to retain them, since they could only do so for some sinister purpose. The plaintiff's complaint, although it does not so plead in terms, may be fairly said, when considered in its entirety, to state facts which show a cause of action by the corporation plaintiff against the several defendants to determine adverse claims upon alleged obligations of the corporation plaintiff made by the several defendants against the corporation plaintiff. So considered the cause of action in the instant case is to be distinguished from that discussed in the case of *Gagossian* v. *Arakelian,* 9 Cal. App. 571 [99 Pac. 1113], wherein it was pointed out that the obligation there in suit was that of a third party.

[24] Although no demurrers were interposed in the court below attacking the sufficiency of the complaint upon any grounds, it is now insisted that the corporation plaintiff's complaint does not state a cause of action sufficient to bring it within the purview of section 1050. In this behalf it is argued that the complaint is defective in not affirmatively alleging that any claim or demands were being made or being asserted against the corporation for or on account of the bonds in suit. We think it fairly inferable from all of the allegations of the plaintiff's complaint that the several defendants who were in possession of the bonds in suit were asserting or were about to assert claims against

the plaintiff based upon the obligations of said bonds. Moreover, it is apparent from the answers and cross-complaints of the several defendants that whatever defect there may be in the complaint in the particular stated was cured by the allegations of the answers and the cross-complaints, which show definitely and affirmatively that the several defendants were asserting or about to assert a claim adverse to the plaintiff based upon the bonds in suit.

The plaintiff's cause of action as pleaded does not purport to be grounded in fraud and therefore contains no allegation as to the time of the discovery of the pledge and transfer by Hewlett to the other defendants of the bonds in suit. If it were otherwise proper that such an allegation be made, then let it be noted that no demurrers upon that or any other ground were interposed to the plaintiff's complaint, and in so far as the plea of the statute of limitations as interposed in the answers of the several defendants may concern or involve the question of the need of notice to the plaintiff of the time when the adverse claims in suit were first asserted, it will suffice to say that the plaintiff's complaint was filed October 22, 1914, and the record shows some evidence to support the trial court's finding on the statute of limitations, to the effect that Flora Wenban Mills, the secretary of the corporation plaintiff, who lived with Caroline S. Wenban and was fully acquainted with the latter's affairs and the affairs of the corporation plaintiff, never heard or knew of the adverse possession of the bonds in suit until the month of January, 1913, and that Caroline S. Wenban herself never heard of any such adverse possession until she obtained the information to that effect from Flora Wenban Mills.

[25] It necessarily follows from what we have said that a reversal of the judgment must be ordered, and in view of the fact that the case must go back for a new trial it is proper to note that the action being one in equity, and equity having assumed jurisdiction of the subject matter and of the parties, will proceed, to the end of preventing a multiplicity of suits, to dispose, as prayed for, of all of the equities and priorities, if any, existing between the several parties to the case.

The judgment is reversed and the cause remanded for a new trial.

Richards, J., Seawell, J., Lawlor, J., Waste, J., and Shenk, J., concurred.

Mr. Chief Justice Myers, deeming himself disqualified, did not for that reason participate.

Rehearing denied.

In denying a rehearing the court filed the following opinion on July 3, 1924:

THE COURT.—The rehearing is denied. It is appropriate however, to say that the use of the word "loaned" in the statement of the opinion that "Mary A. Huntington loaned him [the defendant Hewlett] $200,000.00 on the security of two hundred of the bonds" is inaccurate. While Mary A. Huntington did not actually loan the defendant Hewlett $200,000, she did assign to him a one-half interest in a note calling for the payment of $400,000. In consideration of this assignment Hewlett was to turn over to her certain stock in the Pacific Ranch and Land Company, and as a guarantee that she would receive $200,000 out of this stock he deposited with her as security the said 200 bonds. While he did not, as he had agreed, turn over to Mary A. Huntington the stock referred to, he did deposit the bonds with her as security when she made the assignment to him of the one-half interest in the note. The opinion upon this particular phase of the case should have read that she held the said 200 bonds as security for the $200,000 which she was to receive from the stock of the Pacific Ranch and Land Company.

All concurred except Myers, C. J., and Sturtevant, J., *pro tem.*, who deemed themselves disqualified and did not participate herein.