[Civ. No. 488. Fourth Appellate District.—September 13, 1932.]

In the Matter of the Estate of BENIGNO BARREIRO, Deceased. MARIA TERESA BARREIRO et al., Respondents, v. BANK OF ITALY NATIONAL TRUST AND SAVINGS ASSOCIATION (a Corporation), as Executor, etc., Appellant.

754

Wright & McKee and C. M. Monroe for Appellant.

Jesse George and C. A. Brinkley for Respondents.

MARKS, J.—A rehearing was granted in this cause to permit further consideration of the question of whether or not this court was justified in its former conclusion that a substantial portion of the 1000 shares of the capital stock of the Compania de Inversiones de la Baja California, S. A., a Mexican corporation (hereinafter referred to as the "Compania"), belonged to Gertrudis Marquez Barreiro as tenant in common with her former husband, was justified by the evidence before us. In determining this question we have again reviewed the printed record in this cause and the more extensive typewritten record in the appeal taken by the minors from portions of the same judgment attacked in this case (*Estate of Barreiro, ante,* p. 153 [13 Pac. (2d) 1017], which we are permitted to do). (*Hollenbach* v. *Schnabel,* 101 Cal. 312 [40 Am. St. Rep. 57, 35 Pac. 872]; *Sewell* v. *Price,* 164 Cal. 265 [128 Pac. 407]; *Wood* v. *Kennedy,* 117 Cal. App. 53 [3 Pac. (2d) 366].)

It is evident from all the records which we have, that at least up to the time of these two appeals, it was the opinion of the executor, the widow and her counsel and others having to do with the probate proceedings, that Gertrudis Marquez Barreiro had "a vested interest", as expressed by witnesses for the executor, in a portion of the property in its possession. (See *Estate of Barreiro,* 86 Cal. App. 764 [261 Pac. 509].) It is evident from the written opinion of the trial judge that he also indulged in this assumption, although no findings were made upon this question. By an order not involved in this appeal he set aside the order involved in

*Estate of Barreiro,* 86 Cal. App. 764 [261 Pac. 509], as beyond the jurisdiction of the probate court to make.

Our review of the records in the two appeals has led us to the conclusion that we would have to indulge in a presumption, which would be authorized by law upon the evidence before us, in order to sustain our former position. There is now pending in the Superior Court of San Diego County an action to determine whether or not Gertrudis Marquez Barreiro became the owner with Benigno Barreiro of a portion of their community property, if any, at the time of their final divorce in 1922, the decree of divorce not attempting to divide or dispose of their community property, if they owned any. Counsel for appellants have become exercised at the thought that what we said in our former opinion might become the law of the case and hamper the trial court in its decision of this question. The presumption which we have to invoke to sustain our former position is rebuttable and might be overcome by evidence. A decision of the question of whether or not Mrs. Barreiro is the owner of any portion of the property now possessed by the executor is not necessary on this appeal nor was it necessary in the appeal by the minors. (*Estate of Barreiro, ante,* p. 153.) We do not desire to hamper the decision of a trial judge in another action by any unnecessary language used by us, if it could possibly be construed as establishing the law of the other case. Whatever may be said in *Estate of Barreiro, ante,* p. 153, and what we may say in this opinion must not be considered or construed as holding that Gertrudis Marquez Barreiro owned, as tenant in common with her deceased husband, any portion of the capital stock of the Compania or any definite portion of the property now in the possession of the executor of his last will and testament so that such a holding may become the law of the case controlling in any proceeding in this estate or in any other action or proceeding in which this question may be presented for decision.

This is an appeal taken by the executor of the last will and testament of Benigno Barreiro, deceased, from a portion of an order of the Superior Court of San Diego County, settling its fourth annual account, in which order the executor was directed to pay out of its own funds into the treasury of the Compania the sum of $4,782.95, and also the sum of

$500, out of the funds of the estate. This is a companion case with one bearing the same title, *Estate of Barreiro, ante,* p 153, wherein the minors appealed from the same order, the opinion in which case is referred to for a more complete statement of the facts than is here incorporated, and a discussion of some questions of law which we find it unnecessary to repeat.

After the death of Benigno Barreiro and the appointment of appellant's predecessor as the executor of his last will and testament, there were found among the effects of the deceased 1000 shares of the capital stock of the Compania made payable to bearer. The then executor caused a meeting of the stockholders of the Compania to be held in Mexico on July 9, 1925, at which time a new board of directors was elected with Norman R. Morison, who was trust officer of the executor and in active charge of the estate, elected as president, and Lewis J. Utt, then the attorney for the executor, named among the directors. The then executor and its successors have ever since continued in control of the affairs of the Compania.

The order of the trial court requiring the executor to pay moneys into the treasury of the Compania is based upon its finding that charges made by attorney Manuel Lujan of Mexico for professional services rendered and expenses incurred were unjust, excessive and no proper charge against the deceased, the Compania or the estate. The task of the trial court in determining the correctness of these charges was made more difficult by the fact that Lujan, prior to the hearing that resulted in the order under consideration, left his home, has not been heard from since and is presumably now dead. Mr. Utt, who acted as attorney for the executor and American adviser for the Compania during all of the time covered by the Lujan account, is also dead. Therefore, the testimony of these two witnesses which would have been most desirable was not available.

While appellant makes several separate specifications of error upon which it relies for a reversal of that portion of the judgment of which it complains, practically all of them may be stated and considered under one head, namely: Has the probate court of California, having jurisdiction over the estate of the deceased, the right to examine the conduct of the executor in managing the affairs of a Mexican corpora-

tion and charge it with expenditures made by it for or through the corporation? This question does not seem to have been directly answered by any of the cases decided in California. The respondents seek to justify the action of the court below upon the theory that the executor possessed the control of all of the stock of the Compania and the complete management of its affairs, using it only as its *alter ego,* and that therefore the court could look through the corporation and examine the actions of the executor and its officers, as though the corporation did not exist. The argument of respondents in support of the order in question is based upon the assumption that the deceased was the sole and only owner of all of the stock of the Compania and of all of the property standing of record in its name. They urge that the corporation after the reorganization meeting of July 9, 1925, ceased to have any actual existence in so far as the management of its properties and affairs was concerned, and served only as a fictitious name under which the executor managed and operated the properties in Mexico. The deceased at the time of his death had possession of all the certificates of stock in the corporation.

It is true that in some instances a court may look through the form of a corporation in order to reach the sole owner of all of the stock when that owner attempts to transact his business in the name of the corporation as his *alter ego.* There must be a unity of interest and ownership between the two individualities, and such a state of facts that would perpetrate a fraud and work an injustice upon an innocent party by the recognition of the existence of the corporation separate and apart from the identity of the individual owning all its stock and operating through it, to justify such an action by the court. (*Minifie* v. *Rowley,* 187 Cal. 481 [202 Pac. 673]; *Wenban Estate, Inc.,* v. *Hewlitt,* 193 Cal. 675 [227 Pac. 723].)

The first question to be considered is the legality of the reorganization meeting held on July 9, 1925, at which a new board of directors was elected for the Compania. As we have observed, the stock in the corporation was issued to bearer and was in the possession of the executor. The right of possession of only that portion of the stock belonging to Mr. Barreiro vested in the executor at the time of its appointment.

Section 313 of the Civil Code, as it existed prior to the amendments of 1931, provided that "shares of stock of an estate of a minor or insane person may be represented by his guardian, or of a deceased person by his executor or administrator". This section has been construed to give the right to executors to vote stock belonging to their testators upon exhibiting a certified copy of letters testamentary without formal transfer of the shares on the books of the corporation. (*Smith* v. *San Francisco etc. Co.*, 115 Cal. 584 at 591 [56 Am. St. Rep. 119, 35 L. R. A. 309, 47 Pac. 582]; *Market Street Ry. Co.* v. *Hellman*, 109 Cal. 571 [42 Pac. 225].) Of course, this right given to the executor to represent the stock of the deceased at any meeting of stockholders of the Compania could only extend to such stock as was owned by Mr. Barreiro at the time of his death. The executor could not represent the stock owned by Mrs. Barreiro, if any, without authority from her.

There seems to be no great difference between the rules of descent established by the Mexican law and those prevailing in California. The estate of a deceased person in both jurisdictions descends to the heirs subject to administration. (Art. 3232 of the old Mexican Civil Code, stated to be art. 1286 of the new code; art. 3235 of the old Civil Code, stated to be art. 1290 of the new code; art. 3173 of the old Civil Code, stated to be art. 1990 of the new code; art. 3703 to art. 3706 of the old Civil Code and arts. 3726, 3727 of the old Civil Code consolidated in art. 1704 of the new code.) Articles 3728, 3729 and 3730 of the old Mexican Civil Code, re-enacted into articles 1704, 1705 and 1706 of the new code, give the executor such powers as are authorized by law and by the testator in a will or those which the heirs expressly give him, and no others. In the will admitted to probate the Southern Trust and Commerce Bank was given charge of the heritages of the children of Mr. Barreiro and the desire was expressed that Eustaquio Valle continue carrying on the business of the Compania as he was doing prior to the death of deceased. Under this power in the will, which seems to be permitted under the provisions of the Mexican Civil Code, it is argued with some force that the executor possessed the same rights to represent the deceased and his children in voting the stock of the Mexican corporation that it would have possessed under

the authority given by section 313 of the Civil Code of California had the Compania been a California corporation. For the purpose of this opinion we will assume, without holding, that such powers were given to it.

Article 204 of the Commercial Code of Mexico provides that the call for meetings of a corporation shall be made by the board of directors, or by the examiners, and that more than one-half of the capital stock must be represented. Article 203 of the same code provides that the calls to general stockholders' meetings shall be made by a notice published in the official journal of the state, district or territory wherein the corporation has its domicile, and that the notice must contain a statement "of the proceedings for the day, or of all questions to be submitted for the deliberation of the meeting. Every resolution adopted in contravention of this article shall be void". These rules were not all followed in calling the meeting, nor in calling any of the other stockholders' meetings held after the death of Mr. Barreiro. No calls for these meetings were published in the official journal of the state. If we were to give literal interpretation to the provision of this section, that "every resolution adopted in contravention of this article shall be void", we would be forced to the conclusion that all proceedings taken at these meetings were void for not alone lacking the authority of law, but as being taken contrary to the express provisions of law.

The by-laws of the Compania provided that calls for general stockholders' meetings must be signed by the president or by the commissary and be published for at least ten days in advance of such meeting. The by-laws further provided that when all of the capital stock is represented a meeting may be held without the necessity of a call. Mr. Uribe, a Mexican attorney called as an expert on Mexican law, testified that the provisions of the Commercial Code would prevail over those of a by-law.

The trial court was of the opinion that as all of the stock of the corporation was actually represented at the meeting of July 9, 1925, including the stock of Mrs. Barreiro, if any, those participating in the meeting would be estopped from contesting its legality and that the directors elected at such meeting would at least be the *de facto* directors of such corporation and entitled to act as such until removed

from office by a proceeding instituted by an authority other than that of one of those participating in the meeting. (*Guarantee Loan Co.* v. *Fontanel,* 183 Cal. 1 [190 Pac. 177]; *Dolbear* v. *Wilkinson,* 172 Cal. 366 [Ann. Cas. 1917E, 1001, 156 Pac. 488]; *San Buenaventura Mfg. Co.* v. *Vassault,* 50 Cal. 534; *Guaranty Loan Co.* v. *Treadwell,* 53 Cal. App. 538 [200 Pac. 653].) We have been referred to no opinion of anyone learned in the law of Mexico and to no decision of a Mexican court upon this question.

At the time of the meeting of July 9, 1925, Mrs. Barreiro was represented there by Messrs. Herman Freese and Stephen Connell, who were her attorneys. The minors were represented by their guardian, and the executor bank was represented by its trust officer and by Mr. Lewis J. Utt, its attorney in the probate proceedings. The minutes of this meeting recite that all of the stock of the Compania was represented as follows: Eustaquio Valle, 1 share; Norman R. Morison, 1 share; Stephen Connell, 1 share; Anton J. Schreiber, 1 share; M. G. Richardson, 1 share; D. M. Plaister, 1 share; Lewis J. Utt, 994 shares. The minutes recite that Morison was named president of the meeting and Valle its secretary and that Messrs. Connell and Utt were named inspectors to count the number of shares and votes. Messrs. Morison, Richardson, Schreiber, Connell and Utt were elected directors, and Morison and Utt were elected president and secretary respectively. The by-laws were amended by making Tia Juana as well as Mexicali an authorized place for holding the corporate meetings. These minutes were protocolized before a Mexican judge of the first instance and were recorded in the registry at Tia Juana, Mexico. The Mexican law provides that the certificates of stock of a corporation must be actually and physically present and exhibited at a stockholders' meeting. It is doubtful if this provision was complied with at this meeting, or at any of the other stockholders' meetings.

From what we have said it is apparent that the meeting of July 9, 1925, was not legally called and held, and that if the proceedings there had are to be considered binding upon the stockholders it must be because of the doctrine of their estoppel to question the legality of the meeting because of their participation therein. If they may be estopped to question the legality of this meeting, at least

Mrs. Barreiro is not estopped from questioning the legality of any subsequent meeting, either of the stockholders or of the board of directors, if she be considered a stockholder. No call or notice of any subsequent meeting was given and she did not participate therein. Her attorney, Mr. Connell, was removed as a member of the board of directors.

The Mexican law vests the management of the affairs of a corporation in its board of directors much as does the law of California. No meeting of the board of directors seems to have been held. All the business of the corporation which was referred by the executor to any meetings seems to have been referred to stockholders' and not to directors' meetings. The questions of sales of properties, execution of leases, and other matters of policy, when considered at all, were considered at stockholders' meetings which were not called in accordance with the law of Mexico. The stockholders of a Mexican corporation seem to be given no power over the details of its management under the law of Mexico. Two of the trust officers of the executor made vague references in their testimony to meetings of the board of directors held in the town of Tia Juana or perhaps in Mexicali. That these meetings were anything more than informal gatherings of some or all of the persons acting as directors does not appear. The trial judge in two voluminous opinions filed by him makes the statement that no directors' meetings were held. The minute-books and other Compania records were before him. While we cannot give this statement the dignity or effect of a finding, its truth seems to be borne out by the record. We have carefully searched the bill of exceptions in the appeal now before us and the long typewritten record in the appeal taken by the minors and have found no minutes of directors' meetings, although meetings of the stockholders are set forth at length. If the directors ever assembled in Mexico at other than stockholders' meetings it seems apparent that their convocations were so informal as not to justify any minute record of their proceedings. As far as the record goes no meetings of the board of directors, as the term is known in the law, were held. Therefore, it follows that whatever was done in the name of the corporation after the meeting of July 9, 1925, was done, not only without the authority of law, but in direct violation of the provisions of the Mexican code.

The attitude of the executor in regard to the Compania and the management of the Mexican properties is clearly reflected in its first annual report and account, where it is said: ''Your petitioner, immediately upon its appointment, proceeded to reorganize the said Mexican corporation, and to assume full control and active management thereof. The assets of said Mexican corporation, in addition to securities and personal property held on this side of the line and amounting to some $99,500, consisted of real estate, both improved and unimproved, as well as of mines and of partnership interests in mining and oil ventures and claims, all of said property being located in the northern district of Baja California. The said real estate is located at Tia Juana, at Mexicali and St. Algodones, a small town on the Colorado river opposite Yuma. The collection of rents from said real property, and the execution of leases to tenants has involved and does involve a high degree of attention, as well as responsibility. Your petitioner has had to handle considerable sums of money from this source, as well as to carry on all the business of the decedent, a business which engrossed his entire time, and which consisted of looking after his Mexican interests.''

These statements were made in connection with a request for extra compensation for its services in managing the Mexican property. The executor's trust officer was in the active charge of the administration of the estate and was also president and general manager of the Compania. If the trust officer had rendered these services in his capacity as an officer of the corporation he should have sought his compensation from the Compania and not from the estate. Three thousand dollars as compensation for these extra services was allowed and paid to the executor out of the estate funds.

The books of the Compania were kept by the executor bank and consisted of little more than a cash account. Rents from the Mexican tenants were often paid to the executor and deposited in the estate funds with appropriate cross-entries in the Compania cash-book. It cannot be doubted but that the income of the Compania was expended by the executor alone and that the policy of leases and sales of property were dominated by it.

The Mexican Commercial Code requires that corporations keep an elaborate set of books in forms particularly specified. No effort was made after the death of Mr. Barreiro to keep any such set of books and no attention was paid to any of these requirements.

It cannot be doubted that the executor dominated and controlled all of the affairs of the corporation following the death of Mr. Barreiro. It chose one board of directors and then proceeded to brush aside its authority and administer the properties of the corporation. The only function performed by the Compania seems to have been that of holding the naked title to the Mexican property. The executor brushed aside the legal entity of the corporation and assumed direct control of its property and its affairs.

■ The question, therefore, which presents itself may be stated as follows: Can the executor, after having disregarded the corporate existence and corporate entity, and having failed to observe the provisions of law of the republic of Mexico regarding the functioning of a corporation, and having taken direct charge of the corporate property, hide behind the corporate entity which it did not recognize over a period of years and thus protect itself from losses occasioned by its direct management of the properties of the Compania? The question would seem to contain its own answer.

In this opinion all references to the Code of Civil Procedure are made to that code in effect before the adoption of the Probate Code.

We are next confronted with the question of the jurisdiction of a probate court of California over property owned in Mexico by the Compania which was taken possession of and administered by an executor appointed by the California probate court without any ancillary letters having been issued in Mexico. Section 1913 of the Code of Civil Procedure provides that the authority of an executor or administrator does not extend beyond the jurisdiction of the government under which it was given its authority. The rigorous jurisdictional limitation of the powers of an executor imposed by this section has been somewhat modified by many decisions sustaining the right of an executor to collect debts due the estate in other juris-

dictions when such collections can be made without suit. (12 Cal. Jur. 238, 239, and cases there cited.)

■ It is well settled in California that superior courts have both probate and equity jurisdiction and that where necessary to do justice to all parties concerned, the probate courts may exercise equity jurisdiction. (*Estate of Maxwell*, 74 Cal. 384 [16 Pac. 206]; *Estate of Burton*, 93 Cal. 459 [29 Pac. 36]; *Verdier* v. *Roach*, 96 Cal. 467 [31 Pac. 554, 557]; *Toland* v. *Earl*, 129 Cal. 148 [79 Am. St. Rep. 100, 61 Pac. 914]; *Estate of Bell*, 168 Cal. 253 [141 Pac. 1179]; *Estate of Glenn*, 153 Cal. 77 [94 Pac. 230]; *Bauer* v. *Bauer*, 201 Cal. 267 [256 Pac. 820]; *Estate of Heeney*, 3 Cal. App. 548 [86 Pac. 842]; *Estate of Hill*, 94 Cal. App. 113 [270 Pac. 708].) In *Verdier* v. *Roach, supra,* it was said: "Our superior courts have both probate and equity jurisdiction, so that whenever, in the course of the administration and settlement of estates, our probate statutes are found to be inadequate to authorize and accomplish all that a court of equity is authorized to do in such cases, our superior courts may exercise their equity powers in connection with and as incidental to their powers in probate matters to the extent necessary to a complete administration and distribution of estates; provided, of course, that nothing be done in contravention of any statutory provision."

■ It has long been the rule in equity that where a court has jurisdiction of the person it may enforce a decree *in personam* although it could not enforce it *in rem.* (*Penn* v. *Lord Baltimore*, 1 Ves. Sr. 443 (27 Eng. Reprint, p. 1132); *Massie* v. *Watts*, 6 Cranch, 148 [3 L. Ed. 181]; *Arglasse* v. *Muschamp*, 1 Vern. 75; *Tollor* v. *Carteret*, 2 Vern. 494; *Phelps* v. *McDonald*, 99 U. S. 298 [25 L. Ed. 473]; *Mitchell* v. *Bunch*, 2 Paige (N. Y.), 606 [22 Am. Dec. 669]; *Miller & Lux* v. *Rickey*, 127 Fed. 573; *State* v. *Cronin*, 23 Nev. 437 [49 Pac. 41]; 5 Cal. Jur. 471, sec. 44; *Smith* v. *Davis*, 90 Cal. 25 [25 Am. St. Rep. 92, 27 Pac. 26]; *Peninsular etc. Co.* v. *Pacific S. W. Co.*, 123 Cal. 689 [56 Pac. 604]; *Taylor* v. *Taylor*, 192 Cal. 71 [51 A. L. R. 1074, 218 Pac. 756]; *Redwood Inv. Co., etc.,* v. *Exley*, 64 Cal. App. 455 [221 Pac. 973]; *Cole* v. *Manning*, 79 Cal. App. 55 [248 Pac. 1065].) In the case of *State* v. *Cronin, supra,* it was held that the courts of Nevada, having obtained personal

jurisdiction over the parties therein, had the right to inquire into and determine the powers of a California corporation, its officers and stockholders, under the laws of California, and question the validity of the corporate acts although the courts of Nevada had no jurisdiction over the corporation itself.

For many years it has been held in California that where a California executor has taken charge of and gathered in assets of an estate in a foreign jurisdiction it may be held accountable for them. (*Estate of Ortiz*, 86 Cal. 306 [21 Am. St. Rep. 44, 24 Pac. 1034, 1035]; *Fox* v. *Tay*, 89 Cal. 339 [23 Am. St. Rep. 474, 24 Pac. 855, 26 Pac. 897]; *Estate of Grivel*, 199 Cal. 351 [249 Pac. 184, 185]; *Reed* v. *Hollister*, 44 Cal. App. 533 [186 Pac. 819].) The rule is stated in *Estate of Ortiz, supra,* as follows: "I think the law applicable to the facts is correctly stated by Professor Schouler in his late treatise on Executors and Administrators (2d ed., 1889, sec. 175), as follows: "The earlier rule, frequently asserted in England, in one loose form or another, is, that assets in any part of the world shall be assets for which the domestic executor or administrator is chargeable; the practical effect being to enjoin upon the principal personal representative the duty of procuring, so far as foreign law and the peculiar circumstances will permit, personal assets wherever situated, realizing the bulk of the estate of his decedent as best he may, gathering in the property as one who represents the whole fortune, and having gathered it, account to those interested accordingly. Some of the judicial expressions on this point, to be sure, import too onerous a responsibility on the representative's part; and Mr. Justice Story has pointed out the fallacy of holding a domestic executor or administrator answerable for foreign property, which it is admitted that he can neither collect nor sue upon, nor compel its payment or delivery to himself, by virtue of his domestic appointment—foreign property, we may add, of whose existence, or of the grant of foreign administration for realizing it as assets, he may be quite unaware. And yet, to let external assets knowingly escape his control, and be lost to the estate, when with reasonable diligence they might have been procured, seems a plain dereliction of duty in the principal or domiciliary representative, whose function, as rightly understood,

is to grasp the whole fortune, as the decedent did during his life, save so far as the obstructive law of foreign situs, or the limitations of his own appointment, may restrain him.' ''

*Estate of Grivel, supra,* is quite similar in fact to the one at bar. The deceased had property in the republic of Mexico and in the United States. He had a former wife and children. There was this difference, that probably there were ancillary probate proceedings in Mexico. The appeal was taken by the domiciliary executor from an order surcharging his accounts. In the course of the opinion the court said: ''Appellant admits that he did sell about 1600 head of cattle, collected debts owing decedent from persons residing or doing business in Mexico and transacted other business in said foreign territory, but claims that in so doing he acted solely as attorney in fact for said (ancillary) administratrix, and not in his official capacity as administrator of the estate. He further admits that moneys derived from the sales of property made in Mexico and which passed into his hands were deposited by his direction in a bank situate in Calexico, county of Imperial, where the business of the estate was transacted by him. It is the insistent claim of appellant that he was acting in two separate and distinct capacities in handling the funds and property of an estate of which he was the domiciliary administrator, to-wit, as agent or attorney in fact of the ancillary administratrix of all property which had its situs in Mexico at the time of decedent's death, and as administrator only of such property as had its situs in the state of California at the time of decedent's death, and to no further extent. We question the soundness of this contention. Appellant was the administrator of the entire estate and of all the funds and property which came into his hands which were admittedly property and moneys belonging to the estate, and it was clearly his duty as such officer to report and account to the court which had appointed him for all moneys and property belonging to the estate which he received into his possession, and it does not matter what the source may have been. We think as a general proposition that the court has inherent power to compel a report of the property which has passed into the hands of the domiciliary administrator even though he claims to have remitted it to the ancillary administrator.''

*Reed* v. *Hollister, supra,* also involved the necessity of a local executor accounting for funds coming into his possession from a foreign jurisdiction and the power of the probate court to require him to account for such funds. After a careful consideration of the case the court reached the conclusion that the probate court had such jurisdiction and that the executor must account to it for such funds.

We have reached the conclusion that the probate court had the jurisdiction to require the executor of the estate of Barreiro to account to it for the Mexican property of which it took control and which it virtually removed from the possession of the Mexican corporation which owned it, and correctly required the executor to render an account of all of the transactions which it conducted in connection with the Mexican property standing in the name of the Compania.

The order of which the executor complains on this appeal is a virtual surcharge of its account in the sum of $4,782.95, on account of moneys paid to and collected by Manuel Lujan. Mr. Lujan, an attorney at law of the republic of Mexico, was apparently the personal attorney of Benigno Barreiro and for the Compania before Mr. Barreiro's death. He acted also as the Mexican adviser to the executor of the estate. The items of the account, showing charges and receipts as summarized by the trial judge, are as follows:

"For services rendered prior to Mr. Barreiro's death, as per statement of June 20th, 1925 (Executor's Exhibit N–2), as follows:

1. Trip to Mexico City re certain appeals pending against the Compania and the City of Mexicali as well as the Galeana case........$ 1,300.00
2. Cardinale attachment .................... 1,775.00
3. Attachment on real property of Paul Kittiquitz ................................ 650.00
4. Two suits against the Compania Commercial.. 500.00
5. Appeal in a criminal case involving Mr. Barreiro ................................ 500.00
6. Consultations with Mr. Barreiro, stated to have been not less than 100 in number..... 1,000.00
7. Drawing up documents and papers.......... 200.00

 Total .............................$ 5,925.00

For services to Compania for the 12 months ending June 6, 1926, as per statement (Executor's Exhibit O–2) of that date, at $350.00 per month ...........................$ 4,200.00

Personal expenses during that year............. 250.00

Compensation for the two months ending August 6, 1926, as per statement dated November 30, 1926 (Executor's Exhibit P–2)........ 700.00

Compensation and expenses on trip to Mexico City in summer and fall of 1926, amounting apparently to ........................... 2,100.00

(Balance the two remittances to him for that purpose of July 27th, 1926, and September 11th, 1926, respectively, hereinafter referred to.)

Making an aggregate of...............$13,375.00

As against these charges he has admittedly been paid:

By Mr. Barreiro in his lifetime (see Executor's Exhibit N–2)......$ 100.00

Other items as shown by said supplement to the Executor's Fourth Account:

November 5, 1925................. 600.00

December 4, 1925................. 500.00

July 27, 1926 (re Lujan's trip to Mexico City) ................. 600.00

August 19, 1926 ................. 400.00

September 11, 1926 (re Lujan's trip to Mexico City) ............... 1,500.00

(I do not count a transmission charge on last item of $32.95 in this connection.)

December 8, 1926 ............... 500.00

Also collections in which Executor's Exhibit O–2, Lujan admits having made and retained as follows:

13 months' rent from the Compania Commercial on the Mexicali and Tia Juana properties affected by the lease litigation, at $450.00 per month ....................... 5,850.00

Interest on the so-called Johnson
 note ....................... 325.00

 Aggregating ............. $10,375.00

This accounting, if correct and com-
 plete, would still leave due to
 Lujan ....................... $ 3,000.00''

The account as revised and allowed by the trial court
is as follows:

"Lujan admits, according to his statements
 (Executor's Exhibits N–2, O–2 and P–2),
 as hereinbefore reviewed, an aggregate of..$10,375.00

This, however, includes what he collected by way
 of interest on the Johnson note, an account
 which was apparently not property of the
 Compania de Inversiones, and should, there-
 fore, have nothing to do with his accounting
 with it................................ 325.00

This leaves of money of the Compania de Inver-
 siones for which he admits being account-
 able ................................$10,050.00

As we have also seen, he is chargeable also with
 the $591.68 collected by him through the
 Cardinale escrow; but since there has been
 reserved for the future the question of
 whether he has earned anything in connection
 with the Cardinale litigation, the question
 whether this debit of $591.68 is to be offset
 against any such charge may properly be re-
 served, and the disposition of said $591.68
 item reserved also. Neglecting this item for
 the present, then, we consider the credit
 side of his account generally.

He is credited with:

Expenses in trip, January and Feb-
 ruary, 1925, to Mexico City,
 amounting altogether to sixty
 days ........................$ 1,200.00

Fees in suits against the Compania
 Commercial ................... 500.00

Consultations with Benigno Barreiro regarding Compania affairs and drawing up documents relative to same .......................... 200.00

Fourteen months' services as consulting Mexican attorney for the Compania de Inversiones subsequent to Mr. Barreiro's death.... 2,100.00

Personal and traveling expenses for ten days in trips to Mexicali..... 200.00

Personal and traveling expenses for thirty days in summer and fall of 1926 in trip to Mexico City ..... 600.00

Making an aggregate of........ 4,800.00

This left him indebted to the Compania de Inversiones to the extent of.... $ 5,250.00''

To the balance of the account just quoted and charged against the executor the court added the sum of $32.95, costs paid on sending money to Lujan in Mexico City.

The items of which appellant complains are those credits either disallowed or reduced. Ruling was reserved on the charge of $1775 for the Cardinale attachment, and $591.68 collected through escrow. We have considered the right of the probate court to reserve ruling on items of an account in *Estate of Barreiro, ante,* p. 153. This portion of that opinion is referred to for a discussion of this question and it will not be necessary to repeat it here.

The court below disallowed the charge of $650 for an attachment on the real property of Paul Kittiquitz. It appears that this grew out of a claim against one Johnson alleged to be due to the Compania Merchantil Internacional, a corporation formerly controlled by Mr. Barreiro, which he placed in the hands of a liquidator for the purpose of liquidation. It is evident that this particular claim for services could not be made against the executor or the Compania, but against the Compania Merchantil Internacional or the liquidator. The trial court reserved a ruling upon the question of a settlement between the executor and the liquidator and this item can undoubtedly be adjusted when that matter is determined.

The charge of $1,000 for not less than 100 consultations by Barreiro with Lujan, and the $200 for the drawing up of documents and papers by Lujan will be considered together. On November 19, 1924, Lujan executed a receipt to the Compania whereby he receipted for $500 in full for his services, both to the Compania and to Mr. Barreiro up to that date and agreed to make no further charge for services to be rendered by him in the two appeals pending in the Supreme Court in the City of Mexico, one on a petition of Miguel Galeana in which the Compania was a third party, and the other an appeal presented against the municipal council of Mexicali. This receipt was dated about seven months prior to the death of Mr. Barreiro. The trial judge was of the opinion that the charges were excessive and were not supported by proper evidence. In this we agree with him. He allowed $200 for these services, which we cannot hold as an unreasonable compensation under the circumstances disclosed by the record.

Lujan presented a bill for services rendered the Compania for fourteen months at the rate of $350 per month. On account of the death of Mr. Utt, and the apparent death of Mr. Lujan, the evidence as to just what these services consisted of is very meager. The trial court found that some services were performed consisting of consultations with Mr. Utt as attorney for the executor and the Compania and that the reasonable value of the services rendered was $150 per month. We think the allowance quite liberal under the circumstances and cannot hold the trial court in error in fixing the compensation at this sum.

The account of Lujan contains three items of traveling expenses, one on a trip to Mexico City concerning the two appeals pending there which we have mentioned, which trip occupied sixty days; another, compensation and expense on a trip to Mexico City in the fall of 1926 in connection with the same two appeals which occupied thirty days, and the third, expenses of trips to Mexicali, which occupied ten days. The total amount claimed by Lujan for these items was $3,850, which the court held to be excessive and not justified by the evidence. In so far as they included any compensation for services rendered in connection with the two appeals the correctness of the ruling of the trial court in excluding such charges from

the account cannot be questioned in view of the receipt given by Lujan on November 19, 1924. The trial court allowed him traveling expenses of $20 per day for each day occupied on the trips to Mexico City and to Mexicali. The receipt of Lujan did not contain any agreement not to make a charge for traveling expenses and a reasonable allowance to cover such expenditures was undoubtedly correct. We think the sum of $20 per day fixed by the trial court for this purpose was ample and that it cannot be questioned by us. These allowances made by the trial court are supported by competent evidence in the record and as the question is merely one of the sufficiency of the evidence to support the ruling of the trial court, its conclusion becomes final.

■ Appellant urges that the probate court had no authority to direct that the sum of $4,782.95 be paid out of the private funds of the executor into the treasury of the Compania, but only had authority to surcharge the executor's account with this amount and direct it to be paid into the estate funds. This money was withdrawn from the treasury of the Compania by the executor without any authority from the board of directors or any lawful procedure. The trial court was undoubtedly correct in directing it to be returned to the source from which it was taken.

Appellant maintains that the finding of the trial court to the effect that the executor failed to use due diligence, prudence and care in its transactions with Lujan, and that Lujan was overpaid and was permitted to retain more money than he was reasonably entitled to, due to the negligence of the executor, is not supported by the evidence and is contrary to it. It relies upon the rule that where the executor exercises its best judgment and due care and prudence in the selection of an agent or attorney who is well recommended, it is not liable for money lost by the insolvency of the agent unless the executor was negligent and careless in its dealings with him. (24 Cor. Jur. 126; *Estate of Taylor,* 52 Cal. 477.) Appellant particularly urges that it should not be chargeable with the sum of $5,850, thirteen months' rental from the Mexicali and Tia Juana properties, nor with overpayments to Lujan on account of his trips to Mexico City.

■ The real properties from which the rentals were collected were the ones involved in an action instituted by Mr. Barreiro to cancel leases held by the Compania Commercial. (See opinion in *Estate of Barreiro, ante,* p. 153, for further particulars.) When the suits were instituted the rents were paid into court. Lujan, as the attorney of record in these cases, in some manner obtained possession of the money, retaining it when he disappeared, which was some considerable time later. During the time that this money was in his possession the executor did not seek to have him pay it into the treasury of the Compania, where it rightfully belonged, nor in any manner did it seek its recovery. The trial court concluded, and we think correctly so, that the loss of this money was directly traceable to the executor, who, over a considerable period of time, failed to collect from Lujan, and seemingly acquiesced in his retention of this money.

■ Appellant urges that it was not negligent in overpaying Lujan on account of his expenses and services rendered on the two trips to Mexico City, because, at the time the payments were made, it did not have actual knowledge of the receipt which Lujan had executed on November 19, 1924. The evidence discloses that this receipt was found among the papers of Mr. Barreiro, of which the original executor took possession at the time of his death. No good reason appears why the executor by the exercise of reasonable diligence could not have acquainted itself with the contents of this receipt long before it made any of these payments to Lujan. We think its negligence is apparent in both instances and that the court properly directed it to replace the money lost as a result thereof.

■ Appellant next complains that the trial court wrongfully placed upon it the burden of proving the correctness of its accounts rather than placing upon the contestants the burden of proving that the accounts were not correct. In this contention we cannot agree with appellant. The amount of evidence which a probate judge may require of any executor in support of the correctness of any account is largely a matter of his own discretion. Where there is no contest it is the duty of the trial court to satisfy itself of the correctness of the account, and, within the limit

of reason, it may require the executor to produce such evidence as will satisfy it in this respect.

The portion of the order approving the final account, appealed from by the executor, is affirmed.

Barnard, P. J., and Scovel, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 11, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 10, 1932.