171 Cal.App.2d 452 (1959)
Estate of STEVE G. BARBIKAS, Deceased. VYTINA SOCIETY, Appellant,
v.
BESSIE BARBIKAS PHILLIPS, as Executrix, etc., et al., Respondents.
Civ. No. 18021. 
California Court of Appeals. First Dist., Div. Two. 
June 23, 1959.
 Tinning & DeLap, Robert Eshleman and Francis A. Watson, Jr., for Appellant.
 Robert H. Kroninger and J. W. O'Neill for Respondents.
 DOOLING, J.
 This is an appeal by the residuary legatee, Vytina Society, from an order of the trial court denying objections to the final accounting of the executrices of the estate of Steve G. Barbikas.
 Barbikas died on December 5, 1951, leaving a will and a codicil nominating six beneficiaries as joint executors. When the will was admitted to probate, on February 1, 1952, respondents Bessie Phillips and Pearl Jackson were appointed executrices thereof, the other named executors declining to act. The will provided for several specific bequests and the residue of the estate was left in trust to pay the income for 20 years to the named beneficiaries. At the end of the 20-year period the remaining trust estate was to go to appellant for the purpose of establishing a school in Greece.
 Included in the residue was certain real property containing a bar and restaurant business with liquor licenses which had been held by decedent. This business was continued in operation by the executrices and on December 5, 1952, the court made an order authorizing the executrices to continue to operate the business and to expend not to exceed $5,100 for equipment.
 On April 6, 1953, respondent Phillips filed a petition for instructions directing that the business be sold and respondent Jackson and other beneficiaries then filed a petition for an order that the business be retained. In June 1953 the court ordered the sale of the business and respondent Jackson with two other beneficiaries filed a notice of appeal from the order. On March 18, 1954, the parties stipulated that the appeal be dismissed and sale of the business was then directed by the court.
 On November 22, 1954, the business was sold to George Azevedo for $54,459.95. It was agreed by respondents and Azevedo that respondent Phillips' attorney, Judson, should act as escrow agent for the sale. There was testimony that title companies and banks do not commonly handle escrows involving liquor licenses and that it was common practice for the attorney for the seller or buyer to act as the escrow agent. There was also testimony that Judson regularly acted as escrow agent in matters of that kind. Judson was a respected *456 attorney, was highly recommended to Mrs. Phillips and had been City Attorney of Pittsburg. Azevedo testified that he had every trust and confidence in Judson.
 The escrow funds in this transaction were deposited in a trustee account maintained by Judson. A deed to the real property was executed by respondents and was recorded March 16, 1955, but a bill of sale for the personal property was not received by Azevedo until June of 1955. During this period respondent Jackson's attorney, O'Neill, made many inquiries of Judson as to the bill of sale and was led to believe that the delay was caused by Mrs. Phillips' (then residing in Connecticut) neglect in not signing the bill of sale. O'Neill testified that he had prepared a petition for removal of Mrs. Phillips as executrix but after an independent investigation he discovered that Mrs. Phillips was not responsible for the delay.
 After learning this, on June 7, 1955, O'Neill by letter requested that the escrow money be turned over to the estate. A second request was made on June 16, 1955, and O'Neill was informed that Judson was out of the city and would return on July 6. O'Neill went to Judson's office on July 6 and at that time learned from Judson that in early January 1955 he had embezzled the escrow funds and that he had attempted to delay the completion of the sale in the hope that he could make reimbursement.
 It was decided by respondents with the concurrence of O'Neill that if a criminal complaint were filed against Judson all hope of recouping the money would be lost. The embezzlement was reported to the district attorney who stated that his office would do nothing unless and until formal proof was offered and a complaint was requested.
 Judson presented to respondents and their attorneys a statement of his assets and liabilities and copies of his income tax returns. In addition a check was made of the records in the offices of the county tax collector and county assessor. Mr. O'Neill, as attorney, was satisfied that the only source of funds sufficient to recoup the loss was from Judson's prospective fees to be obtained from pending personal injury damage suits and other court matters. Judson stated that he could pay at least $5,000 by September 1955 and the balance by the end of the year. The $5,000 was not paid by September 1, 1955, and when contacted Judson stated that there had been dilatory tactics by an insurance adjuster, that an important case had been taken off calendar because of his absence *457 in another court, and that expected settlements had not materialized.
 Two payments of $2,000 each were made on September 20 and September 30, but when further payments were not made the matter of the embezzlement was presented to a judge of the Superior Court of Contra Costa County. A citation was issued to the executrices requiring them to appear on December 5, 1955, to show cause why an accounting had not been made.
 Prior to the date fixed for the hearing the respondents' attorneys and Judson met in the judge's chambers and it was decided that if the money was not repaid by December 19, 1955, the court would order a final account and the respondents would consent to an order removing them as executrices. However, shortly after this meeting a criminal complaint was filed against Judson, an information was filed, he pleaded guilty and was sentenced to prison. The executrices were removed and the public administrator was appointed.
 The executrices' accounting was filed on June 13, 1956, and the amended objections to accounting were filed July 20, 1956.
 The probate court made the following finding:
 "In connection with the embezzlement by Attorney Judson, the Court finds that there was no misconduct, or negligence, or misfeasance on the part of the executrices in employing him, and that in his choice they exercised due prudence and were guilty of no negligence; and, further, that there was no negligence on their part for failure to act by which the estate was injured after his embezzlement was brought to light."
 Following this finding the probate court refused to surcharge the executrices with the sum lost by Judson's embezzlement.
 Appellant here argues:
 1. That the liability of the executrices for the embezzlement of their attorney is absolute;
 2. That in any event they failed to exercise ordinary care and prudence in their management of the estate;
 3. Since the money was embezzled before the escrow holder delivered the deed and bill of sale the loss fell on the purchaser Azevedo and the executrices were derelict in not instituting action against him.
 [1] The general measure of the duty of an executor or administrator has been stated in a number of decisions to be that he act "... with that degree of prudence and diligence which a man of ordinary judgment would be expected to *458 bestow upon his own affairs of a like nature." (In re Moore, 96 Cal. 522, 525 [31 P. 584]; Estate of Burke, 198 Cal. 163, 166 [244 P. 340, 44 A.L.R. 1341]; Estate of Robl, 163 Cal. 801, 802 [127 P. 55, Ann.Cas. 1914A 319]; Estate of Buchman, 123 Cal.App.2d 546, 556 [267 P.2d 73, 47 A.L.R.2d 291].) Probate Code, section 920, states substantially the same measure in providing that an executor or administrator "shall not ... suffer loss by the decrease or destruction without his fault, of any part of the estate." (Emphasis ours.)
 Appellant however contends that this rule does not apply to loss due to misconduct of the executor's attorney, in which case it is claimed the liability is absolute. It is true that in the case of In re Ogier, 101 Cal. 381, 385 [35 P. 900, 40 Am.St.Rep. 61], the statement is found that "if the attorney employed should be derelict in his duty, and should receive and misappropriate funds of the estate, the executor would be liable therefor to the legatees under the will," and a substantially similar statement is found in Highfield v. Bozio, 188 Cal. 727, 729 [207 P. 242]. We do not regard these statements as binding authority for the reason that the question of the executor's liability for the misconduct of his attorney was not before the court in either of those cases and the statements therefore are only dicta. In Ogier no authority for the quoted statement is cited and in Highfield the only authority cited is Ogier. The question actually before the court in both cases was whether a testator could impose the legal duty upon an executor to employ an attorney designated in the will and the statement quoted from Ogier and the like statement in Highfield, citing only Ogier, were made arguendo and without the citation of any authority.
 [2] The generally accepted rule is thus stated in a note in 144 American Law Reports, page 881, supported by the citation of authorities: "However, where an executor or administrator was found to have exercised the care, diligence, and prudence in the selection of his attorney, or in his activities with him in regard to the estate, that a reasonable person would have exercised under similar circumstances, it has been held ... that no liability attached to such executor or administrator ... for loss due to the misappropriation of funds or other misconduct by, or the negligence, lack of skill, or insolvency of his attorney." The same rule is announced in 33 Corpus Juris Secundum, Executors and Administrators, section 248, pages 1256, 1257 and in the 1958 Cumulative Supplement *459 to 21 American Jurisprudence, Executors and Administrators, new section 254.1, pages 40-41.
 This rule was approved and applied by the court in Estate of Barreiro, 125 Cal.App. 752, 772 [14 P.2d 786], where the rule is stated, citing 24 C.J. 126 and Estate of Taylor, 52 Cal. 477, "that where the executor exercises its best judgment and due care and prudence in the selection of an agent or attorney who is well recommended, it is not liable for money lost by the insolvency of the agent unless the executor was negligent and careless in its dealings with him." Estate of Taylor, 52 Cal. 477, cited in Barreiro, similarly held that where the executors in good faith and without negligence employed an agent to collect a debt in another state they were not liable for the loss of the money through his misconduct and insolvency.
 [3] Executors, who are not themselves lawyers, would normally be derelict in their duty to the estate and to those interested in it if they did not employ the services of an attorney and if they exercise due care in the selection of an attorney they should not be absolutely bound by his derelictions but should only be required to "act ... with that degree of prudence and diligence which a man of ordinary judgment would be expected to bestow upon his own affairs of a like nature." (In re Moore, supra, 96 Cal. 522, 525.) Indeed if their liability for the derelictions of their attorneys was absolute, even though they were personally blameless, few individuals would be willing to assume the duties of an executor or administrator.
 Appellant's claim that the executrices were negligent in their handling of the sale rests upon the contentions: 1. that the executrices were negligent in permitting Judson to act as escrow holder; 2. that they were negligent in permitting six months to elapse without insisting on the closing of the escrow and the payment of the money; and 3. that after the discovery of the embezzlement they were negligent in taking no legal action against Judson or Azevedo.
 Throughout the executrices had the advice and counsel of their attorneys, upon which, as lay persons unfamiliar with the law, they had the right to rely unless the situation was such that a lay person exercising common prudence would do otherwise. The statement of the New Jersey court in In re Sharp's Estate, 61 N.J.Eq. 601 [48 A. 327, 329], is here pertinent:
 "In the selection and employment of successive counsel in the endeavor to collect the claim in question, it is impossible *460 to deny that the administrator had done what a man of sense and intelligence would have done in respect to his own private affairs. To find him lacking in duty because he accepted the advice of the counsel whom he had employed would require him to be charged, not with his own negligence, but with the negligence of others. Administrators are necessarily compelled at times to employ legal advisers, and commit to their wisdom and intelligence the conduct of litigation. When they have made the selection in good faith and with reasonable prudence, they are not to be charged with the errors or mistakes of those whom they have employed."
 [4] When Judson suggested that he would act as escrow holder he was acting as Mrs. Phillips' attorney and O'Neill, who was Mrs. Jackson's attorney, was present and not only acquiesced but actively concurred. The probate judge was well within his discretion in determining that in thus following the advice of their attorneys the executrices acted with the necessary prudence. Indeed the facts would hardly support a finding that in following the advice of their attorneys that Judson should so act they were not exercising the "prudence and diligence which a man of ordinary judgment would be expected to bestow upon his own affairs of a like nature."
 After Judson's delay in closing the transaction became apparent Mrs. Jackson was constantly making inquiries of O'Neill, her attorney, about the delay and he in turn testified that he telephoned to Judson approximately 50 times and Judson continually replied that the delay was because his client, Mrs. Phillips, who had gone to live in Connecticut, had not executed and returned first the deed and then the bill of sale. O'Neill in May, still believing Judson's statements, prepared a petition for the removal of Mrs. Phillips as executrix but before filing it had inquiries made of Mrs. Phillips by an officer of appellant who lived near Mrs. Phillips in Connecticut. After these inquiries developed that Mrs. Phillips had never received a bill of sale for execution as Judson had frequently stated, O'Neill confronted Judson and the disclosure of the embezzlement was made. In the meantime Mrs. Phillips in Connecticut who had extensive correspondence with her attorney, Judson, also made telephone calls to him and to a sister, residing in California, in an attempt to discover what was delaying the closing of the sale. She testified that she had no information which led her to believe that Judson would not act "truly and faithfully as the escrow agent" until she was informed of his embezzlement. On these facts a finding that *461 the executrices were not guilty of negligence is amply supported.
 [5] After the embezzlement was discovered Mrs. Jackson went immediately to the district attorney and disclosed the facts. Of this interview Mrs. Jackson testified: "we talked it over, and we decided the best thing to do is give Mr. Judson a chance to pay back the money," and again: "he [the District Attorney] said, 'Oh, well, I will be watching him. What do you want us to do?' ... I don't know who said it, but the idea, the conclusion we came to, is give the man the chance to pay the money back."
 Mrs. Jackson immediately thereafter consulted her attorney, O'Neill, and after talking to Judson and making an investigation which satisfied him that Judson had no assets subject to execution, O'Neill also concluded that the only chance to recover the money was to give Judson the opportunity to pay it from expected fees. In the meantime Mrs. Phillips telephoned to an attorney, Papas, in Stockton, who had represented her in personal affairs and advised him of the embezzlement. She was also in touch with Mrs. Jackson and was kept fully advised that with the active cooperation of Mrs. Jackson's attorney, O'Neill, they were attempting to collect from Judson out of anticipated fees, which appeared to them to offer the only possibility of recovering the money. The court said in In re Moore, supra, 96 Cal. 522, 525: "It frequently happens that indulgence to a debtor is a matter of prudence on the part of the creditor," and the executrices certainly cannot be held guilty of negligence as a matter of law in putting the matter in the hands of other attorneys and following their advice as to the best method of procedure under the unfortunate circumstances which had arisen.
 [6] To the claim that the executrices should have proceeded against Azevedo (Todd v. Vestermark, 145 Cal.App.2d 374 [302 P.2d 347]) there are at least two answers: 1. There is no evidence that their attorneys ever advised them that such a remedy might be available and not being lawyers they could not be expected without legal advice to know of this possibility; and 2. since the statute of limitations had not run when they were removed as executrices and the public administrator substituted in their place, that remedy was still open. [7] "[A]n action against a representative to recover the value of real property on the ground of his having neglected to bring an action for its recovery cannot be maintained *462 where the right of entry is not barred." (20 Cal.Jur.2d, Executors and Administrators, 239, p. 368.)
 [8] Appellant also seeks to charge the executrices with a claimed loss in delaying the sale of this property. While the property was originally appraised at a higher value, such appraisal is not conclusive, but only prima facie, evidence of its then value. (Estate of Carver, 123 Cal. 102, 106 [55 P. 770].) An expert testified that the values had not changed between the time of the testator's death and the sale of this property and no affirmative evidence of any decrease in value was produced. The finding that no loss occurred by the fact that the property was not sold earlier is supported by the record.
 Appellant objects to an item of $500 paid for restaurant equipment in the bar and restaurant property afterwards sold, which was charged to principal. [9] The case which they cite, Estate of Roberts, 27 Cal.2d 70, has this to say at page 80 [162 P.2d 461]: "Whether these expenses were chargeable to the corpus or income of the estate depends largely on the condition of the property when the executrices received it. 'The cost of putting into tenantable repair premises which were not in such repair when received by the trustee ... is payable out of principal; but the cost of thereafter keeping the premises in repair is payable out of income.' "
 [10] Appellant objected to this item in its written objections but no reference to it in the reporter's transcript is given by appellant and the trial court's order settling the account also makes no reference to it although the order recites: "the Court will here state the order which is sought by the Objectors," and thereafter cites and disposes of all of the other objections here urged on appeal. We must assume in the face of this record that this particular objection was not urged upon the court. In the absence of some showing in the record that it was, it is too late to raise this question on appeal, especially in view of the fact that the record is completely silent as to the facts necessary to be shown under the quoted rule of Estate of Roberts, supra, to properly determine whether the charge should be made against principal or income. No showing was made, one way or the other, as to whether this expenditure was necessary to put the restaurant into "tenantable condition." If the objection had been presented at the hearing we may reasonably assume that evidence on this question would have been produced.
 Appellant also objects to the charging of all the expenses of administration against the corpus of the estate, claiming *463 that an allocation should be made between principal and income following the formula set out in Civil Code, section 730.15, the Principal and Income Law. The portion of that section relied upon by appellant reads as follows:
 "All ordinary expenses incurred in connection with the trust estate or with its administration and management, including regularly recurring taxes assessed against any portion of the principal, water rates, premiums on insurance taken upon the estates of both tenant and remainderman, compensation of assistants and court costs on regular accountings, except attorneys' fees and trustees' compensation, shall be paid out of income. ... Attorneys' fees for ordinary or current services and trustees' compensation for both ordinary and extraordinary services, exclusive of compensation for acceptance or distribution, shall be paid one-half out of income, one-half out of principal, or in such other proportion as the court may direct; except that in the case of testamentary trusts where on any current trustees' accounting there are found to be insufficient principal moneys available for the payment of trustees' compensation, the court may direct that for such period the whole or any part of such compensation shall be paid out of any income available, subject to such conditions, if any, relative to reimbursement out of principal as the court may direct. ..."
 Following the provisions of this section appellant argued in its opening brief that all of the expenses of administration except attorneys' and executrices' fees should have been charged against income and that one-half of the latter fees should have been charged against income and the other one- half against principal. So calculating the fees it sets out a table on page 21 of the opening brief under which of the total expenses of administration $7,556.05 would be charged against income and $2,910.18 against principal. That this was also appellant's position before the probate court appears clear from the following quotation from the order of the probate judge herein appealed from:
 "Concerning the fourth objection to the account, to the effect that all except $2,910.18 of the $10,466.23, costs of administration, should be allocated to income, the Court is unable to agree."
 The question as thus broadly presented was correctly decided by the probate court. [11] The necessary probate proceedings leading to the distribution of an estate to trustees *464 pursuant to a will establishing a trust are not "expenses incurred in connection with a trust estate or with its administration and management" within the meaning of Civil Code, section 730.15. Every estate of a testator must go through the regular course of administration and distribution whether or not one or more trusts may be established by the will of the testator. The costs of such proceedings are costs of the probate of decedent's will and the administration of his estate, and not costs of the "administration and management" of the trust. [12] Except where otherwise provided, expressly or by necessary implication, in the testator's will "the expenses of administration prior to the establishment of the trust are chargeable, insofar as it is adequate to meet them, to the corpus of the estate which is ultimately to form the trust and not to the income accruing thereon during the period of probate administration." (Estate of Schiffmann, 86 Cal.App.2d 638, 647 [195 P.2d 484] and cases there cited.)
 [13] In its closing brief appellant attempts somewhat to alter its position, claiming that because the distribution of the estate was unreasonably delayed and the executrices, who are also trustees under the will and beneficiaries of the income, elected to carry on the bar and restaurant business to enhance their income from the trust, at least those expenses so incurred should be allocated according to Civil Code, section 730.15. The record fails to show that any such contention was made before the probate court and no such contention was made in appellant's opening brief. A party is not ordinarily permitted to adopt one theory in the trial court and change to another theory on appeal (Ernst v. Searle, 218 Cal. 233, 240-241 [22 P.2d 715]; Gibson Properties Co. v. City of Oakland, 12 Cal.2d 291, 299 [83 P.2d 942]) nor to raise a new question for the first time in the closing brief (Utz v. Aureguy, 109 Cal.App.2d 803, 808 [241 P.2d 639]).
 Complaint is made of the refusal to admit a letter into evidence. The record fails to show any offer of the letter, as pointed out in respondents' brief. The reply brief is silent on the subject and on the record the question is not properly before us. In any event the letter dealt with the delay in selling the bar and restaurant and since we have affirmed the probate court's finding that the estate suffered no loss thereby the cause of the delay becomes unimportant.
 Order affirmed.
 Kaufman, P. J., and Draper, J., concurred.