[Civ. No. 24350. Second Dist., Div. Three. Nov. 4, 1960.]

THERIL LUND, Respondent, v. UTTER-McKINLEY MORTUARIES (a Corporation) et al., Appellants.

McClosky, Mitchell & Markey for Appellants.

John L. Bland and Robert H. Wallis for Respondent.

BISHOP, J. pro tem.*—Under date of April 6, 1957, defendant Maytor H. McKinley wrote the plaintiff:

"Dear Theril:

"Following our conversation this morning we have agreed for and on behalf of your services to do the following:

"1—To present you with a $2,500.00 bonus which you have received.

---

*Assigned by Chairman of Judicial Council.

"2—To hand you each month as severance pay, $600.00 per month for one year.

"I sincerely hope that you appreciate my generosity and fairness in effecting this settlement with you.

"As always, with particular regards,

"Cordially yours,

(Signed)               Maytor

"Maytor H. McKinley."

The crucial issue of the case centered around this letter. Was the agreement that culminated in the letter an account stated whereby a total of $9,700 was to be paid the plaintiff, as the bonus then due him, or was it an agreement to pay the plaintiff $600 per month for twelve months, in addition to the $2,500 bonus, in consideration of his promise to hold himself on call for such services as the defendants might wish, and to continue loyal to their business enterprise? The complaint alleged an account stated. The answer denied that an account had been stated, and alleged in several ways that the alternative answer should be given. The trial court, tentatively concluding that an account had been stated, steadfastly refused to receive evidence that would tend to establish that the parties should have arrived at a different figure. In so doing, however, he excluded some evidence offered by the defendants that was pertinent to the basic question. The judgment for $6,450 (so limited because the plaintiff had received $750 in addition to the $2,500), is, therefore, being reversed. As the case may be tried again, we are discussing the questions presented on the appeal a bit more fully than we might otherwise do.

The plaintiff, from the latter part of 1953 up to April 5, 1957, served as the controller of the defendant corporation. During the latter years his compensation was measured in two ways: $750 each month by way of salary, and 3 per cent of the net profits each year, referred to by the parties as a bonus. The bonus was not drawn in a lump sum, at the end of the year, but amounts credited on it were withdrawn from time to time, account being kept of them.

Under date of April 5th, the defendant Maytor H. McKinley, president of the defendant corporation, dictated a letter to the plaintiff, advising the latter that he was no longer to be the controller, although his services had been "absolutely satisfactory." A month's check for $750 was enclosed, as severance pay, and the plaintiff was asked to send in his

resignation and to turn over his keys and any files his successor should have.

Following the receipt of this letter several events took place. First of all, the plaintiff obtained an interview with the defendant president, as a result of which the president directed his secretary to write the plaintiff that his salary would continue for one calendar year at the present rate of $750 per month. On the same day, April 5th, the plaintiff wrote the president a letter containing this paragraph: "In consideration of $2,500.00, receipt of which is hereby acknowledged, and for the further consideration of your promise to extend my salary at the present rate of $750.00 per month for one calendar year on this date payable monthly, as consideration for my past services and for consideration for my remaining available for some other possible assignment, I hereby tender my resignation as Vice-President and Controller of the Utter-McKinley Mortuaries." This was followed by a telephone conversation between the two, and the letter of April 6th, with which we began this opinion. Then, May 1st, the defendant president again wrote the plaintiff, this time advising him that, because of some conduct of the plaintiff that he (the president) had heard about, the plaintiff had ". . . abrogated our understanding concerning your severance and under such circumstances that no severance pay should be afforded you, and yet under such circumstances you have received $2,500." He added that no further payments were to be made him.

At this point we note that while all the correspondence referred to was on the letterheads of "Utter-McKinley Mortuaries," none was expressly made on behalf of the corporation, and only the May 1st letter used the descriptive word "President" in connection with the signature of defendant Maytor H. McKinley. All parties knew, however, that he was acting, not in his individual capacity, but as the president of the defendant corporation. The plaintiff was not McKinley's employee. No question during the trial, or on appeal, has been raised as to the authority of the individual defendant to act for the defendant corporation, and no contention has been made that the judgment should not have run, as it does, against the individual defendant as well as against the corporation. We see no reason, therefore, to differentiate from now on between the defendants.

True to the prophecy of May 1st, the defendants made no further payment to the plaintiff and he brought this action,

alleging that an account had been stated by and between himself and the defendants "evidenced" by the writing of April 6th. By way of answer, the defendants denied that there had been an account stated, and affirmatively alleged that the writing of April 6th, admittedly correctly pleaded, was ". . . for and in consideration of the written agreement and oral promises of plaintiff to remain available for employment assignments . . ." with the defendants, and in further consideration of plaintiff's promised continued goodwill and loyalty. Both considerations had failed, the answer further alleged, and as a consequence the contract was abrogated by the plaintiff and rescinded by the defendants.

The cross-complaint, as defendants now refer to their counterclaim, we find drafted in four counts. The first one was a reincarnation of the affirmative defense to the effect that the writing of April 6th was not an account stated, but a promise to pay $2,500 and $600 x 12 made in consideration of the promise on plaintiff's part to stand by, ready to help out, loyally, whenever called upon. Defendants paid $2,500 plus $750 to the plaintiff, but plaintiff did not perform, all to defendants' damage in the sum of $3,250.

The second count does not expressly deal with the $600 per month engagement of the April 6th letter. It alleges that the letter, in which defendants agreed to pay plaintiff the $2,500 bonus, was executed in the belief that the bonus for the year was $2,100, whereas, in fact, it was $3,260.26, which sum the plaintiff "thereupon" withdrew and in addition drew the $2,500, "without the authority of defendant, . . . all to said defendant's damage in the sum of $2,500.00"

The third count reiterates the first, adding that the defendants gave the plaintiff a notice that they rescinded the agreement of April 6th, when he did not perform. The fourth cause of action is the third expressed as a common count; an action for money had and received.

The unmistakable and common theory of these four causes of action is that the events culminating in the writing of April 6th did not result in an account stated, whereby a total of $9,700 was to be paid, but in an agreement to pay a bonus of $2,500 (already paid), and $600 a month for standby services, which the plaintiff had breached.

There was a pretrial conference, but it left the real issue that which was presented by the pleadings. In their pretrial statement the defendants had listed the issues to be determined as being: "1. Whether an account was stated by reason

of Exhibit 'A' attached to the complaint. 2. Whether plaintiff wrongfully failed to perform express and implied covenants of continued good-will, loyalty and faithful service to defendants. 3. Whether plaintiff wrongfully withdrew the sum of $2,500.00 from defendants' funds and account. 4. Whether the purported agreement dated April 30, [*sic*] 1957, marked Exhibit 'A,' and attached to the complaint, was or should be rescinded. 5. Damages, if any, due plaintiff on the complaint and/or due defendants on the cross-complaint on file herein.''

The pretrial conference order recites that ''. . . it is agreed that the issues to be determined are those . . .'' just quoted. Obviously, ''issues'' two and four would arise only if it should be decided that an account was not stated by reason of Exhibit ''A,'' the letter of April 6th, and the third issue had reference to the second cause of action of the cross-complaint, dealing with the bonus of either $2,500 or $3,260.26.

With the central issue thus existing, the plaintiff put on his case, calling two witnesses, the defendant Maytor H. McKinley under [Code Civ. Proc.] section 2055, and himself. Plaintiff testified that he had convinced the defendants that the books as kept did not correctly reflect the net profit, before taxes, which was the basis upon which his 3 per cent bonus was to be figured. This was so because the books contained expenditures which were in the nature of gifts to members of defendant's family, dues to various clubs and other expenses, claimed not to be legitimate business expenses. These amounted, during the past four years, to an average of around $100,000 a year. Deduct the total of $400,000 from the expenses of the business as shown on the books and the result is a greater net profit of that sum—on which around $12,000 bonus was due and still to be paid to the plaintiff. With the give and take that occurs between good friends— note the $2,500 bonus to pay the $2,100 the defendants allegedly believed due—the final agreement, the plaintiff testified, was that of April 6th—$2,500 in hand paid, $600 per month to follow for a year, to pay in full the bonus due him.

Near the close of plaintiff's case, the trial judge indicated that, on the evidence before him, he was inclined to conclude that there had been an account stated. We do not interpret the remarks of the trial judge as closing the door to further evidence on the main issue, but he made it plain that until his tentative conclusion, that an account had been stated

April 6th, was shaken, he would not receive evidence as to what the balance agreed upon should have been.

In taking this position, the trial judge stood upon solid ground. ▮▮ In the case of *Gardner* v. *Watson* (1915), 170 Cal. 570, 574 [150 P. 994, 995] we read: "The action upon an account stated is not upon the original dealings and transactions of the parties. Inquiry may not be had into those matters at all. . . . As has been said, the original transactions between the parties are not the subject of inquiry and may not be made the subject of inquiry except upon such equitable considerations as fraud, duress, or mistake. And if it be sought to avoid the legal effect of the account stated upon any of these grounds, they must be pleaded." Again we find, in *Young* v. *LoPresti* (1928), 95 Cal.App. 79, 82 [272 P. 310, 312]: "The items of the original accounts are not proper subject of inquiry upon an action for an account stated."

We find a little different statement of the rule in *Wenban Estate, Inc.* v. *Hewlett* (1924), 193 Cal. 675, 702, 703 [227 P. 723, 734]: "While it is the general rule that the expressed consideration of an agreement is not conclusive upon the question as to what was in fact the real consideration for the agreement, still it is a well-settled and recognized exception to this rule that the legal effect of an account stated may not be opened and defeated by a mere showing of a lack of consideration, nor can an account stated be attacked and opened by the party to whom it was rendered and accepted in any other way than by appropriate pleading and proof of its procurement through fraud, duress, or mistake, or other ground which would appeal to a court of equity in an action for the avoidance of the account stated. This is held to be so upon the theory that an attack upon an account stated for lack of consideration is forever foreclosed by the covenants and agreements of the parties, as expressed in the agreement itself. (*Gardner* v. *Watson,* 170 Cal. 570 [150 P. 994].) . . . If it be conceded that after events disclosed by the record before us tend to show that the account stated was made and based upon a claim or demand of doubtful validity and value, still the adjustment of a doubtful right is a good consideration for an account stated, and therefore the party aggrieved will not be heard to say, in an endeavor to avoid the result of an account as stated, that the claim or demand upon which it was made and based was unjust and invalid. (*Gardner* v. *Watson, supra.*)"

█ As already noted, there was no defensive pleading that recognized the possibility that there might have been an account stated, but, that alleged that, if so, it was brought about by fraud, mistake or duress. The trial judge was warranted, by the evidence, in tentatively concluding that there had been an account stated, and in sustaining objections to evidence that would only serve to go behind the account as stated to show that the real balance was something other than that agreed upon.

The trial judge was very cooperative in defendants' efforts to establish a record and many of the 301 pages of the reporter's transcript are taken up with offers of proof. Among them we find several to which the defendants now point and argue that they should have been received. █ They contend, for example, that some of the evidence offered would have established that there was no consideration for an account stated. Of this they may not now complain, for there was no issue concerning its absence listed among the issues that survived the pretrial conference. It was, consequently, not an issue in the case. (*Dell'Orto* v. *Dell'Orto* (1959), 166 Cal.App.2d 825, 831 [334 P.2d 97, 101] ; *Greenberg* v. *Bank of America* (1959), 175 Cal.App.2d 664, 666 [346 P.2d 848, 850].)

█ In the many, many pages setting forth the evidence offered in vain, we do find some, however, that while inadmissible to prove that the sum agreed upon was incorrectly figured, was competent and pertinent to the main issue, for it would test the credibility of the plaintiff, as a witness, concerning a material matter. The crux of the dispute between the parties concerned the purpose of the $600 per month. The $2,500 was not in dispute ; it was labelled "bonus." The $600 was "severance pay" but the interpretation that the plaintiff put upon it, in his testimony, was that both the $2,500 and the $7,200 were the "bonus" coming to him, the total that he should have been paid, but had not, during the past few years. Would it not have been a fair test of the credibility of plaintiff's testimony to have known that the plaintiff, speaking not only as controller, but also as the employee affected, had in writing declared that the bonuses due him, in the critical years, were far less than that claimed to have been demanded after his discharge? The defendants offered to prove such statements had been made by the plaintiff, the offers being made "on all of the issues" and to impeach the plaintiff as a witness. Not because it would surely

have changed the conclusion at first tentatively held by the trial court, and then found to be a fact, that the $7,200 to be paid was a part of the bonus agreed to be due, but because it might have changed it, and so the judgment, the ruling appears prejudicially erroneous.

The judgment is reversed.

Shinn, P. J., and Ford, J., concurred.