[Civ. No. 25860.   First Dist., Div. Four.   Mar. 6, 1969.]

EARL COKE, as Director of Agriculture, etc., Plaintiff and Respondent, v. FIREMAN'S FUND AMERICAN INSURANCE COMPANIES, Defendant and Appellant.

William L. Ferdon, William E. Trautman and Chickering & Gregory for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Walter S. Rountree, Assistant Attorney General, and Roderick Walston, Deputy Attorney General, for Plaintiff and Respondent.

CHRISTIAN, J.—Defendant Fireman's Fund American Insurance Companies appeals from a money judgment rendered against it in an action brought by respondent Director of Agriculture in behalf of three milk producers, upon a bond given by appellant as surety that the principal, Santa Clara Creamery, Inc., would pay its milk and cream suppliers minimum prices established by the Director of Agriculture pursuant to the Milk Stabilization Act (Agr. Code, § 4200 et seq. [now § 61801 et seq.]; references herein are to the Agricultural Code prior to its recodification in 1967). In compliance with Agricultural Code section 4376, the bond was "conditioned upon the payment *in the manner required by this chapter,* of all amounts due to producers for fluid milk and fluid cream purchased by such licensee or applicant . . ." (Italics added.)

In March and April of 1962 the principal, Santa Clara Creamery, Inc. (hereinafter Creamery), entered into contracts with the three producers for the purchase of certain amounts

of milk monthly from each producer at lawful prices. Creamery did in fact purchase the agreed-upon amounts of milk and sent the producers checks for the correct minimum prices. But there was also evidence that the making of the contracts, or their continued performance by Creamery, was conditioned upon the producers' paying to Gene Collins—the president, general manager and 90 percent majority stockholder of Creamery—fees of 4¾ cents per gallon of milk sold. The payments were made by means of checks made payable to Collins personally and mailed to his residence; however there was evidence that Collins was using the money—or representing to the producers that he was—to meet the obligations of Creamery and to enable it to remain in business as a milk distributor. Because the payments to Collins were not entered on Creamery's books, state audits intended to insure lawful pricing did not disclose the scheme. Appellant surety likewise had no knowledge of the rebate payments during the period of the bond.

The producers testified that they were forced to pay these rebates in order to get or retain the milk sales contracts and that economic pressure compelled them to pay Collins even though they knew that he had no lawful right to exact such payments.

The trial judge found that the producers' payments to Collins constituted rebates to Creamery, that they were required of the producers as a condition to obtaining milk contracts, and that they were a means of Creamery's evading payment of the lawful minimum price. The judge also found that Collins dominated and controlled Creamery and concluded (1) that he was merely its *alter ego* for the purpose of soliciting and collecting the rebates, and (2) that Creamery had thus defaulted on its obligation to pay minimum prices for milk. The court held appellant liable on its bond.

We do not treat in detail appellant's contentions that the milk producers for whose benefit the bond was given exonerated the surety from its obligation either by violating their duties of disclosure to the surety or by waiving any benefits under the bond; these contentions are disposed of by the recent holding, in *Coke* v. *Reliance Ins. Co.* (1968) 262 Cal.App.2d 406 [68 Cal.Rptr. 741], that such defenses are unavailing where this statute was designed to protect milk producers from themselves as well as from others.

The remaining contention is that because Creamery always

gave the suppliers checks for the full lawful price, and the bond covered only Creamery and not Collins, the court erred in attributing the actions of Collins to Creamery.

One of the trial judge's conclusions of law was that Collins "was the alter ego of the principal for the purpose of soliciting and receiving the rebates . . ." Appellant contends, citing *Olympic Capital Corp.* v. *Newman* (C.D.Cal. 1967) 276 F.Supp. 646, that as a matter of law the *alter ego* doctrine may not be used to impose liability upon a corporation for the acts of an individual. Several California cases have explicitly used the *alter ego* doctrine to find a corporation liable for the acts of an individual or individuals. (See, e.g., *Gordon* v. *Aztec Brewing Co.* (1949) 33 Cal.2d 514 [203 P.2d 522]; *Wenban Estate, Inc.* v. *Hewlett* (1924) 193 Cal. 675 [227 P. 723]; *Pearsall* v. *Townsend* (1935) 7 Cal.App.2d 162 [45 P.2d 824]; *Judelson* v. *American Metal Bearing Co.* (1948) 89 Cal. App.2d 256 [200 P.2d 836] [dictum].) While we therefore question the soundness of appellant's major contention, we abstain from an analysis of the facts in this case in relation to the *alter ego* doctrine; the liability of the surety may be upheld on another basis that is both simpler and more direct.

██ Under terms of the statute, the bond was given to assure payment of the lawful price "in the manner required by" law. The manner of payment has been specified in a regulation promulgated by the Director of Agriculture, as follows: "Each payment shall be made on or before the date due, shall be *in the full amount required* and shall be made by cash or valid bank check which is immediately negotiable." (Italics added; Cal. Admin. Code, tit. 3, § 2040.) There was evidence that Creamery benefited from the 4¾ cents per gallon kickbacks exacted from the producers; hence Creamery cannot be regarded as having made payment "in the full amount required." The circumstances reasonably support an inference that the arrangement which was made for the victims of this oppression to make their checks payable personally to the president, general manager and major shareholder of Creamery instead of to the corporation was a transparent subterfuge designed to prevent the Department of Agriculture from learning what was happening. That evidence supports the court's general finding that "the principal, through its president, Gene Collins, required each producer to pay Collins a monthly sum . . . to enable the principal to maintain its operations as a milk distributor."

Such a procedure is totally inconsistent with the making of payments ''in the manner required'' and the liability of both principal and surety is thereby established.

The judgment is affirmed.

. Devine, P. J., and Rattigan, J., concurred.